Appeal No. 14-35035

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

————————

TRADER JOE'S COMPANY,
*Plaintiff-Appellant,*

*v.*

MICHAEL NORMAN HALLATT,
DBA PIRATE JOE'S,
AKA TRANSILVANIA TRADING,
*Defendant-Appellee.*

————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
THE HONORABLE MARSHA J. PECHMAN, CHIEF JUDGE
CASE NO. 2:13-CV-00768-MJP

————————

## APPELLANT'S OPENING BRIEF

————————

BRIAN M. BERLINER
JORDAN RAPHAEL
O'MELVENY & MYERS LLP
400 South Hope Street
Los Angeles, California 90071
Telephone: (213) 430-6000

ANNA-ROSE MATHIESON
TIM BYRON
O'MELVENY & MYERS LLP
2 Embarcadero Center,
28th Floor
San Francisco, California 94111
Telephone: (415) 984-8700

*Attorneys for Plaintiff-Appellant Trader Joe's Company*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Plaintiff-Appellant Trader Joe's Company ("Trader Joe's"), by and through its counsel of record, hereby discloses:

1.     Trader Joe's is a wholly-owned subsidiary of T.A.C.T. Holding, Inc.

2.     No publicly held corporation owns ten percent or more of Trader Joe's stock.

Respectfully submitted,

Date:  May 23, 2014                    O'MELVENY & MYERS LLP

By:     /s/ Brian M. Berliner
        Brian M. Berliner
        of O'Melveny & Myers LLP

        *Attorneys for Plaintiff-Appellant*
        *Trader Joe's Company*

i

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................1

JURISDICTIONAL STATEMENT ........................................................4

STATEMENT OF ISSUES PRESENTED..............................................5

STATEMENT OF THE CASE...............................................................6

      A.     The Trader Joe's Story......................................................6

      B.     Pirate Joe's Opens in Canada as a
            Knockoff Trader Joe's Store.....................................11

      C.     The District Court Action .........................................15

SUMMARY OF ARGUMENT ..............................................................19

STANDARD OF REVIEW ...................................................................22

ARGUMENT .......................................................................................23

    I.     THE DISTRICT COURT ERRED IN DISMISSING
         TRADER JOE'S LANHAM ACT CLAIMS.....................23

      A.     The Lanham Act's Extraterritorial Application
            Is Not a Question of Subject-Matter Jurisdiction ....................23

      B.     The District Court's Extraterritoriality Analysis
            Is Also Incorrect on the Merits ................................27

           1.     The Supreme Court's Decision in *Steele*
                Makes Clear That the Lanham Act Extends
                 to the Conduct Alleged ..............................27

           2.     The Viability of the *Timberlane* Factors
                Is Questionable ...........................................32

           3.     Even If the *Timberlane* Factors Are
                Appropriate in Certain Lanham Act Cases,
                They Do Not Apply Here .............................33

           4.     The *Timberlane* Factors Are Easily Satisfied Here........35

                a.     Pirate Joe's Actions Affect American
                      Foreign Commerce and Cause Trader Joe's
                      Cognizable Injury Under the Lanham Act ..........35

ii

# TABLE OF CONTENTS
## (continued)

Page

b. The Third *Timberlane* Factor
Also Favors Jurisdiction......................................42

(i) There Is No Conflict with
Canadian Law or Policy............................44

(ii) Hallatt, a U.S. Permanent Resident
Alien, Conducts Business
in the United States ...................................45

(iii) The Court Has Many Options in
Ensuring Hallatt Complies
with Court Orders .....................................45

(iv) Pirate Joe's Conduct Significantly
Affects U.S. Commerce ...........................47

(v) Hallatt Purposely Affects U.S.
Commerce ..................................................48

(vi) Hallatt's Effect on U.S. Commerce
Was Foreseeable ......................................48

(vii) The "Relative Importance" Factor
Favors Trader Joe's..................................49

II. THE DISTRICT COURT ERRED IN DISMISSING
TRADER JOE'S STATE LAW CLAIMS..........................................50

A. The District Court Erred in Dismissing
Trader Joe's State Law Dilution Claim ...................50

B. The District Court Erred in Dismissing
Trader Joe's CPA Claim ..........................................54

CONCLUSION ......................................................................................58

iii

# TABLE OF AUTHORITIES

**Page**

## CASES

*AE ex rel. Hernandez v. Cnty. of Tulare*,
  666 F.3d 631 (9th Cir. 2012) ........................................................ 22-23

*Am. Ass'n of Naturopathic Physicians v. Hayhurst*,
  227 F.3d 1104 (9th Cir. 2000) ............................................. 54

*Am. Rice, Inc. v. Ark. Rice Growers Co-op. Ass'n*,
  701 F.2d 408 (5th Cir. 1983) ............................................. 30

*Arbaugh v. Y & H Corp.*,
  546 U.S. 500 (2006).................................................... 19, 24, 25, 32

*Basis Int'l Ltd. v. Research in Motion Ltd.*,
  827 F. Supp. 2d 1302 (D.N.M. 2011) ................................... 30

*Bulova Watch Co. v. Steele*,
  194 F.2d 567 (5th Cir. 1952) ............................................. 29

*Carolina Cas. Ins. Co. v. Team Equip., Inc.*,
  741 F.3d 1082 (9th Cir. 2014) ........................................... 40

*Century 21 Real Estate Corp. v. Sandlin*,
  846 F.2d 1175 (9th Cir. 1988) ........................................... 40

*Conestoga Servs. Corp. v. Exec. Risk Indem., Inc.*,
  312 F.3d 976 (9th Cir. 2002) ............................................. 23

*EEOC v. Arabian Am. Oil Co.*,
  499 U.S. 244 (1991)........................................................ 30

*Eichacker v. Paul Revere Life Ins. Co.*,
  354 F.3d 1142 (9th Cir. 2004) ........................................... 57

*Enesco Corp. v. Price/Costco Inc.*,
  146 F.3d 1083 (9th Cir. 1998) ..................................... 36, 38

*Experience Hendrix LLC v. James Marshall Hendrix Found.*,
  240 F. App'x 739 (9th Cir. 2007) ....................................... 52

# TABLE OF AUTHORITIES
## (continued)

**Page**

*George W. Luft Co. v. Zande Cosmetic Co.*,
   142 F.2d 536 (2d Cir. 1944) ...............................................................28

*Gund v. Philbrook's Boatyard*,
   374 F. Supp. 2d 909 (W.D. Wash. 2005) ...........................................52

*Haberman v. Wash. Public Power Supply Sys.*,
   744 P.2d 1032 (Wash. 1987) ..............................................................52

*Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*,
   719 P.2d 531 (Wash. 1986) ....................................................... 55, 56

*Hartford Fire Ins. Co. v. California*,
   509 U.S. 764 (1993)...........................................................................32

*Henderson ex rel. Henderson v. Shinseki*,
   131 S. Ct. 1197 (2011).......................................................................24

*Hokto Kinoko Co. v. Concord Farms, Inc.*,
   738 F.3d 1085 (9th Cir. 2013) ...........................................................36

*Hypertherm, Inc. v. Precision Prods., Inc.*,
   832 F.2d 697 (1st Cir. 1987)..............................................................39

*Intelsat USA Sales Corp. v. Juch-Tech, Inc.*,
   935 F. Supp. 2d 101 (D.D.C. 2012).....................................................53

*Kwai Fun Wong v. Beebe*,
   732 F.3d 1030 (9th Cir. 2013) ...........................................................26

*Lacey v. Maricopa Cnty.*,
   693 F.3d 896 (9th Cir. 2012) .............................................................40

*Leeson v. Transamerica Disability Income Plan*,
   671 F.3d 969 (9th Cir. 2012) .............................................................26

*Lion Hotels Franchising, Inc. v. MAK, LLC*,
   663 F.3d 1080 (9th Cir. 2011) ...........................................................57

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Love v. Associated Newspapers*, *Ltd.*,
   611 F.3d 601 (9th Cir. 2010) ........................................................ 41-42

*Love v. Mail on Sunday*,
   473 F. Supp. 2d 1052 (C.D. Cal. 2007) ............................................42

*Maier Brewing Co. v. Fleischmann Distilling Corp.*,
   390 F.2d 117 (9th Cir. 1968) ...............................................................39

*McGinnis v. T-Mobile USA, Inc.*,
   No. C08-106Z, 2008 WL 4772127 (W.D. Wash. Oct. 8, 2008) ......................57

*McGlinchy v. Shell Chem. Co.*,
   845 F.2d 802 (9th Cir. 1988) .............................................................32

*Metro Indus., Inc. v. Sammi Corp.*,
   82 F.3d 839 (9th Cir. 1996) ..............................................................43

*Morrison v. Nat'l Austl. Bank Ltd.*,
   561 U.S. 247 (2010) .............................................................. 27, 30

*Nat'l Abortions Fed'n v. Operation Rescue*,
   8 F.3d 680 (9th Cir. 1993) ................................................................18

*Nordstrom, Inc. v. Tampourlos*,
   733 P.2d 208 (Wash. 1987) ..............................................................56

*Ocean Garden, Inc. v. Marktrade Co.*,
   953 F.2d 500 (9th Cir. 1991) ................................................... passim

*Panag v. Farmers Ins. Co. of Wash.*,
   204 P.3d 885 (Wash. 2009) ....................................................... 55, 56

*Phelps v. Stomber*,
   883 F. Supp. 2d 188 (D.D.C. 2012) ................................................53

*Playboy Enters., Inc. v. Baccarat Clothing Co.*,
   692 F.2d 1272 (9th Cir. 1982) ...........................................................41

vi

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Pride v. Correa*,
719 F.3d 1130 (9th Cir. 2013) ...........................................................22

*Pro Swing Inc. v. Elta Golf Inc.*,
[2006] 2 S.C.R. 612 (Can.) .................................................................46

*Rajagopalan v. NoteWorld*, LLC,
No. C11–05574, 2012 WL 727075 (W.D. Wash. Mar. 6, 2012) .......................57

*Reebok Int'l Ltd. v. Marnatech Enters., Inc.*,
737 F. Supp. 1515 (S.D. Cal. 1989)...................................................34

*Reebok Int'l Ltd. v. McLaughlin*,
49 F.3d 1387 (9th Cir. 1995) ................................................... passim

*Reebok Int'l, Ltd. v. Marnatech Enters., Inc.*,
970 F.2d 552 (9th Cir. 1992) .................................................. passim

*Safeway Stores, Inc. v. Rudner*,
246 F.2d 826 (9th Cir. 1957) ................................................................39

*Scotch Whiskey Ass'n v. Barton Distilling Co.*,
489 F.2d 809 (7th Cir. 1973) ................................................................30

*Sebelius v. Auburn Reg'l Med. Ctr.*,
133 S. Ct. 817 (2013)...........................................................................25

*Seizer v. Sessions*,
940 P.2d 261 (Wash. 1997) .................................................................52

*Skydive Ariz., Inc. v. Quattrocchi*,
673 F.3d 1105 (9th Cir. 2012) ............................................................39

*Star-Kist Foods, Inc. v. P.J. Rhodes & Co.*,
769 F.2d 1393 (9th Cir. 1985) ................................................ passim

*Starr v. Baca*,
652 F.3d 1202 (9th Cir. 2011) ............................................................38

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Steel Co. v. Citizens for a Better Env't*,
   523 U.S. 83 (1998)................................................................25

*Steele v. Bulova Watch Co.*,
   344 U.S. 280 (1952)........................................................ passim

*Timberlane Lumber Co. v. Bank of Am., N.T. & S.A.*,
   549 F.2d 597 (9th Cir. 1976) ...................................... passim

*Two Pesos, Inc. v. Taco Cabana, Inc.*,
   505 U.S. 763 (1992).................................................... 37, 38

*United States ex rel. Air Control Technologies, Inc.*
   *v. Pre Con Indus., Inc.*,
   720 F.3d 1174 (9th Cir. 2013) .................................... 25, 26

*Vacuum Oil Co. v. Eagle Oil Co. of N.Y.*,
   154 F. 867 (N.J. Cir. 1907)...............................................28

*Viewtech, Inc. v. United States*,
   653 F.3d 1102 (9th Cir. 2011) .........................................22

*Wells Fargo & Co. v. Wells Fargo Express Co.*,
   556 F.2d 406 (9th Cir. 1977) ............................... 35, 43, 48

## STATUTES

15 U.S.C. § 1051 et seq...................................................4

15 U.S.C. § 1062(a) ......................................................45

15 U.S.C. § 1065 ..........................................................10

15 U.S.C. § 1116(a) ......................................................33

15 U.S.C. § 1117(a) ......................................................39

15 U.S.C. § 1121(a) ......................................................25

15 U.S.C. § 1125(a)(1).............................................. 28, 51

# TABLE OF AUTHORITIES
## (continued)

**Page**

15 U.S.C. § 1127 .............................................................................. 19, 28

28 U.S.C. § 1291 .....................................................................................4

28 U.S.C. § 1331 ............................................................................... 4, 19

28 U.S.C. § 1332 .....................................................................................4

28 U.S.C. § 1338 .....................................................................................4

28 U.S.C. § 1367 .....................................................................................4

35 U.S.C. § 271(a) .................................................................................28

RCW § 19.77.160 ............................................................................. 50, 51

RCW § 19.77.930 ...................................................................................53

RCW § 19.86.010(2) ..............................................................................56

RCW § 19.86.020 ............................................................................. 50, 54

RCW § 19.86.920 ......................................................................... 54, 55, 56

Trade-Marks Act, R.S.C. 1985, c. T-13 (Can.) § 38 .............................45

## OTHER AUTHORITIES

5 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* (4th ed. 2012) ........................................................ 28, 39

Andrew Wiggens, *Ikea Recalls Meatballs After Detection of Horse Meat*, N.Y. Times, Feb. 25, 2013, at A4 (http://www.nytimes.com/2013/02/26/world/europe/ikea-recalls-itsmeatballs-horse-meat-is-detected.html) ..........................................37

Restatement (Second) of Conflict of Laws (1971) ................................52

## TABLE OF AUTHORITIES
### (continued)

**Page**

U.S. Citizenship & Immigration Servs., "Maintaining Permanent
    Residence," at http://www.uscis.gov/green-card/after-green-card-
    granted/maintaining-permanent-residence (visited May 21, 2014)...................47

## <u>RULES</u>

Fed. R. Civ. P. 12(b) ................................................................................33

Fed. R. Civ. P. 12(b)(1)................................................................... passim

Fed. R. Civ. P. 12(b)(6)...................................................... 18, 22, 38, 54

## <u>CONSTITUTIONAL PROVISIONS</u>

U.S. Const. art. 1, § 8 ............................................................................28

## INTRODUCTION

The Lanham Act protects the investments of trademark owners by prohibiting infringement that threatens the reputation and goodwill of their marks. The Act is one of the few statutes that Congress extended beyond U.S. borders: as the Supreme Court held more than sixty years ago, the Act makes trademark infringement actionable even if the activity giving rise to the claim occurs outside the United States, as long as the activity has some effect on U.S. commerce. *Steele v. Bulova Watch Co.*, 344 U.S. 280, 287 (1952). Following *Steele*, courts have upheld Lanham Act claims to enjoin the sale of abalone in Asia, to prohibit false advertising in Panama, and to bar the sale of rice in Saudi Arabia. Yet despite the Lanham Act's broad reach, the district court dismissed Trader Joe's Complaint on the pleadings—with prejudice and without leave to amend—because the defendant's activity occurs partly in Canada. This was error. The defendant's infringing conduct directly threatens the reputation and goodwill of Trader Joe's trademarks in the United States, and thus falls squarely within the Lanham Act. For similar reasons, the district court erred in dismissing Trader Joe's state law claims on the basis that Washington state law was geographically limited.

Defendant-Appellee Michael Norman Hallatt, a U.S. resident alien, set up a knockoff Trader Joe's store in Vancouver, Canada. Hallatt's store is decorated with Trader Joe's distinctive and famous South Pacific-inspired trade dress, and

sells only TRADER JOE'S-branded products. Hallatt acquires his products from Trader Joe's grocery stores in the United States. These TRADER JOE'S-branded goods—which have included perishable and frozen goods—are not labeled, packaged, or authorized for resale, and Hallatt does not store them or transport them pursuant to Trader Joe's strict quality-control standards. When Trader Joe's told Hallatt that it would no longer sell goods to him because his unauthorized operation created a serious risk of harm to Trader Joe's customers and to its reputation and famous marks, Hallatt changed the name of his store from "Transilvania Trading" to "Pirate Joe's," sending a clear message of disregard for Trader Joe's concerns.

Relying on the Lanham Act's extraterritorial reach, Trader Joe's filed suit in the Western District of Washington, bringing claims under the Act for trademark infringement, unfair competition, false designation of origin, false advertising, and federal trademark dilution. Trader Joe's also brought claims under Washington state law for trademark dilution and consumer protection violations. The district court, however, dismissed the Complaint for lack of subject-matter jurisdiction, holding that Trader Joe's had failed to make an adequate "showing" of "economic harm" from Hallatt's activities to justify a Lanham Act action. ER20-33. The court also dismissed Trader Joe's state law claims, interpreting the state laws to cover only infringing activity occurring in the state of Washington. ER2-12.

The dismissal of the Complaint was erroneous on many levels. Most fundamentally, the court erred in dismissing Trader Joe's Lanham Act claims for lack of subject-matter jurisdiction because any territorial limits of the Lanham Act do not affect the subject-matter jurisdiction of federal courts. District courts have subject-matter jurisdiction over any case arising under federal law unless Congress, through clear language, places limits on this subject-matter jurisdiction. Here, Congress created no such limits in the Lanham Act.

The order is also wholly inconsistent with controlling Supreme Court precedent interpreting the Lanham Act. *Steele*, 344 U.S. at 287. Trader Joe's, a U.S. corporation, filed suit against Hallatt, a U.S. resident alien, alleging that Hallatt engaged in a course of conduct in both the United States and Canada that injures Trader Joe's in both the United States and Canada. There is no doubt that, under *Steele*, the Lanham Act applies to Hallatt's conduct.

Nor is there any basis for requiring some heightened showing of economic harm simply because Pirate Joe's is located twenty-two miles north of Washington. At the pleadings stage of this case, just as in any other Lanham Act case, it is more than enough that Trader Joe's has asserted serious and plausible allegations of harm resulting from Hallatt's activity. This conclusion is reinforced by a proper application of the *Timberlane* factors, which, contrary to the district court's ruling, this Court has never read to require a "showing" of economic harm.

3

The district court similarly erred in dismissing Trader Joe's state law claims under Washington's Antidilution Act and its Consumer Protection Act. In the face of contrary Washington Supreme Court precedent, the court found the state statutes govern only conduct occurring entirely within the state of Washington. Neither statute is so limited by its language, and Washington courts have applied both statutes to activity occurring outside the state that, as here, has demonstrable effects on commerce and enterprises within the state.

For these reasons, the Court should reverse the district court's dismissal of Trader Joe's claims and remand for further proceedings.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction under 28 U.S.C. § 1291 because Trader Joe's filed a timely notice of appeal from the district court's December 18, 2013 final judgment. The district court had jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338 because Trader Joe's Complaint alleged federal trademark claims under the Lanham Act, 15 U.S.C. § 1051 et seq.; the basis for this jurisdiction is discussed more fully in Section I.A of this brief. The district court had jurisdiction over Trader Joe's state law claims under 28 U.S.C. §§ 1367 and 1332.

## STATEMENT OF ISSUES PRESENTED

This appeal presents the following issues:

1.  Whether the district court erred in dismissing Trader Joe's Lanham Act claims. This issue comprises two subsidiary questions:

    A.  Whether the district court erred in determining that it lacked subject-matter jurisdiction, given that Trader Joe's Lanham Act claims arise under federal law and Congress has not "clearly expressed" any limits on the subject-matter jurisdiction of district courts to hear Lanham Act claims; and

    B.  Whether dismissal of Lanham Act claims on the pleadings is proper where the plaintiff is a U.S. corporation and the defendant is a U.S. resident alien, the defendant makes purchases essential to his infringing activity in the United States, the plaintiff's business in the United States is injured as a result of this infringing activity, and the case presents no issues of international comity.

3.  Whether the district court erred in dismissing Trader Joe's state law claims solely because the alleged infringement occurred outside of the state of Washington.

## STATEMENT OF THE CASE

### A.    The Trader Joe's Story

Plaintiff-Appellant Trader Joe's is a California corporation based in

Monrovia, California.  ER79-80.  Although Trader Joe's is one of the most popular

grocery retailers in the United States today, it grew from humble roots.  In 1958,

the company owned and operated a chain of convenience stores in the Los Angeles

area called "Pronto Markets."  ER81.  While its convenience store model proved

successful, the company noticed a bigger opportunity.  It realized that as

consumers grew more well-traveled and educated, their interests and tastes would

change; even budget-minded consumers would seek out European wines and

exotic cheeses.  *Id.*  Consumers also wanted an alternative to the staid supermarket

shopping experience.  *Id.*  In 1967, at substantial risk, the company abandoned its

convenience store model and embarked on a path to a new retail grocery-shopping

experience.  *Id.*  The name it chose for this new experience was Trader Joe's.

To contrast its stores from the antiseptic look of the average supermarket,

Trader Joe's developed a rustic South Pacific-inspired theme.  *Id.*  Trader Joe's

uses wooden shelving and baskets to display products, and employees in each store

produce hand-drawn signage that evokes the South Pacific and travel in the late

Nineteenth Century.  ER84-85.  Each Trader Joe's store features this seafaring,

South Pacific-inspired trade dress; keeping with this theme, Trader Joe's

6

employees also wear Hawaiian shirts and are called "crew members," "mates," and "captains." *Id*. The experience of shopping at Trader Joe's retail stores is integral to Trader Joe's brand image and fundamental to its business model. ER87.

To set Trader Joe's apart from the mass-produced foods found in the average supermarket, Trader Joe's searched for high-quality, non-traditional products that catered to consumers' changing interests. ER82. Unlike most grocery stores, which mainly stock national brands, Trader Joe's sold these innovative products under the mark TRADER JOE'S. *Id*. Today, Trader Joe's grocery stores sell thousands of TRADER JOE'S-branded products, such as TRADER JOE'S Organic Hummus Dip and TRADER JOE'S Mac & Cheese Bites. ER83.

Over the years, the TRADER JOE'S brand has expanded into a "family of marks" that playfully combine the term "TRADER" or "JOE" with a given name or another word that is suggestive of the product—*e.g.*, TRADER JOSE tequila, TRADER GIOTTO'S Italian foods, and PILGRIM JOE'S Thanksgiving dishes. ER83-84. Of the approximately 4,000 items Trader Joe's stocks at its stores, about eighty percent bear one of the marks in the TRADER JOE'S family of marks. ER84. To maintain the exclusivity of its branded products, Trader Joe's does not sell goods carrying these marks anywhere other than at Trader Joe's retail grocery stores. *Id*.

7

While it projects a fun, carefree image with its hand-drawn signage and Hawaiian shirts, Trader Joe's is serious when it comes to food safety and quality. Trader Joe's state-of-the-art distribution centers receive and store goods pursuant to strict quality control standards. ER86. Trader Joe's requires its vendors to ship food products to Trader Joe's distribution centers in lot-controlled packaging and in sealed, temperature-monitored shipping containers. *Id.* Trader Joe's inspects each delivery to Trader Joe's distribution centers for evidence of product tampering, mishandling, and other issues that could affect the quality and safety of the goods. *Id.* Trader Joe's follows strict quality control procedures for the transportation of its food and beverage products from its distribution centers to its stores. For example, each shipment of goods is sealed before it leaves the distribution center, and packages of goods are labeled by lot number, store number, and order number to aid Trader Joe's in investigating any safety or quality issues. *Id.* Before accepting a store delivery, a crew member at the receiving store must check this seal, inspect the goods, and report any perceived issues. *Id.*

This infrastructure ensures that Trader Joe's only sells the high-quality products that its customers expect and allows Trader Joe's to quickly investigate any safety issues that may arise. Through this quality control system—and because Trader Joe's owns and operates every Trader Joe's store—Trader Joe's can quickly pull from shelves any product that it determines has failed to meet its

high standards. ER87. And because TRADER JOE'S-branded products can only be purchased at Trader Joe's stores, Trader Joe's will accept customer returns without a receipt. *Id*. Trader Joe's routinely refuses requests from third parties seeking to purchase TRADER JOE'S-branded products and resell them in other venues because of the difficulty of ensuring that these third parties will ship, handle, and store food products pursuant to Trader Joe's exacting standards. *Id*. Trader Joe's also refuses such requests because it wants its products to be sold exclusively through the unique shopping experience provided by its stores. *Id*. Trader Joe's does not sell its products online for these same reasons. ER82-83.

Trader Joe's bet big on the mark TRADER JOE'S by using it to identify Trader Joe's grocery stores and the majority of the products sold at those stores. It was a risky proposition, as a bad experience with one of TRADER JOE'S-branded products could taint a consumer's view of all Trader Joe's products and stores. But by ensuring the quality of its products and stores through strict quality control measures, that gamble has paid off. Trader Joe's operates more than 400 grocery stores in thirty-five states across the United States, including 18 stores in the state of Washington. ER82. Through more than forty years of consistent use, the mark TRADER JOE'S has acquired an extraordinary amount of fame and goodwill. Customers have come to closely associate TRADER JOE'S-branded goods with the experience of shopping at Trader Joe's retail stores because Trader Joe's only

9

sells these products in its stores. Customers also understand that any product bearing the TRADER JOE'S mark comes from a Trader Joe's retail store and meets its high standards for quality and safety.

Trader Joe's works diligently to develop and maintain the extraordinary goodwill associated with the TRADER JOE'S mark, and has received numerous U.S. trademark registrations for its marks. These include the word mark TRADER JOE'S for retail store services in the field of specialty foods and beverages (Trademark Reg. No. 2,171,157); for processed foods (Trademark Reg. No. 2,160,601); for staple foods (Trademark Reg. No. 1,424,176); and for beverages (Trademark Reg. No. 2,158,990). ER82-83. Trader Joe's also owns numerous registrations for marks within the TRADER JOE'S family of marks, including TRADER JOSE for beer (Trademark Reg. No. 3,515,993) and JOE'S KIDS for fruit juices (Trademark Reg. No. 2,923,911). ER84. Each of these registrations is valid, subsisting, and incontestable pursuant to 15 U.S.C. § 1065. ER82-84. Trader Joe's also owns a registration for its famous stylized word mark TRADER JOE'S for retail grocery services:



ER82.

Although Trader Joe's currently operates no stores outside the United States, the fame of Trader Joe's and the TRADER JOE'S family of marks has spread to Canada. ER85. Many Canadian customers regularly cross the border into the United States to shop at Trader Joe's stores, including its stores in Washington. *Id*. In 2013, more than forty percent of the credit card transactions at Trader Joe's Bellingham, Washington, store were made by non-U.S. residents, and more than half of the Yelp.com reviews for the Bellingham store were posted by customers who identified themselves as residents of Canada. *Id*. In 2010, Trader Joe's filed two trademark applications in Canada for the TRADER JOE'S mark. ER71-78. On February 24, 2012, the Canadian Intellectual Property Office issued notices of allowance for both applications, finding no other entity had the rights to use Trader Joe's exclusive mark in Canada. *Id*.

### B.  Pirate Joe's Opens in Canada as a Knockoff Trader Joe's Store

Defendant-Appellee Michael Norman Hallatt is a U.S. resident alien and a Canadian citizen. ER80. Hallatt owns and operates a grocery store in Vancouver, British Columbia, Canada, under the name "Pirate Joe's." ER89. Pirate Joe's is decorated in a manner evocative of Trader Joe's famous and distinctive trade dress, including a colorful mural depicting a ship at sea, products sold on wooden shelves and in baskets, and hand-drawn signage. ER89-90. Pirate Joe's storefront

11

prominently displays the words "PIRATE JOE'S" in red, in a text treatment that is strikingly similar to Trader Joe's famous, registered design mark:

 

ER83-84, ER92.

Pirate Joe's only sells TRADER JOE'S-branded products, and carries an inventory of hundreds of such products. ER89-90. Pirate Joe's has stocked and sold products such as TRADER JOE'S Organic Hummus Dip, TRADER JOE'S Mac & Cheese Bites, TRADER JOE'S Gummy Multivitamin Dietary Supplement, TRADER JOE'S Organic Reduced Sugar Raspberry Preserves, TRADER JOE'S Charmingly Chewy Chocolate Chip Cookies, TRADER JOE'S Ready to Bake Brownies, TRADER JOE'S Milk Chocolate Covered Potato Chips, and TRADER JOE'S Roasted Garlic Salsa. ER90-91. Pirate Joe's offers these products at significantly higher prices than the prices Trader Joe's charges for the same products. ER91. Hallatt also promotes Pirate Joe's with a website, piratejoes.ca. ER89.

Trader Joe's first contact with Hallatt occurred in October 2011, when crew members in Trader Joe's Bellingham, Washington, store noticed that he was

visiting the store three to five times per week and buying large quantities of TRADER JOE'S-branded products.  ER88.  Hallatt then informed a Trader Joe's crew member that he was creating a delivery service for people in Canada.  *Id*.  Trader Joe's notified Hallatt that it did not approve of this activity, as it had the potential to harm Trader Joe's and confuse its customers.  *Id*.

On or about January 2012, however, Trader Joe's learned that Hallatt was selling TRADER JOE'S-branded products at a store in Vancouver, Canada, under the name "Transilvania Trading" and was operating a website at transilvaniatrading.ca to promote the store.  *Id*.  Trader Joe's explained to Hallatt that the resale of TRADER JOE'S-branded products outside Trader Joe's quality control structure would frustrate Trader Joe's ability to ensure that the products met Trader Joe's quality standards and to perform product recalls.  ER114-15.  Trader Joe's informed Hallatt that due to his continued resale activity, Trader Joe's would no longer serve him as a customer.  ER88.

Despite Trader Joe's refusal to sell him products, Hallatt continued to stock his store with TRADER JOE'S-branded products.  Hallatt hired third parties to purchase TRADER JOE'S-branded goods, drove to Seattle, Portland, and California to purchase TRADER JOE'S-branded products, and even donned disguises to shop undetected at Trader Joe's stores.  ER88-89.  In March 2012, notwithstanding Trader Joe's refusal to sell to Hallatt, Transilvania Trading was

13

fully stocked with TRADER JOE'S-branded products. ER89. In October 2012, Trader Joe's learned that Hallatt had moved his grocery store operations to a new address in Vancouver and had adopted its current name, "Pirate Joe's." *Id*.

Hallatt and Pirate Joe's do not operate within Trader Joe's strict quality control structures. Rather, Pirate Joe's transportation, storage, and sale of TRADER JOE'S-branded products—which have included perishable and frozen food products—occur completely outside Trader Joe's quality control infrastructure. To Trader Joe's knowledge, Pirate Joe's does not transport products in sealed containers and at controlled temperatures; it does not keep records of transit times and temperatures for shipments; it does not inspect products upon delivery for quality, freshness, and safety before placing them on store shelves; it does not maintain strict temperature controls for the storage and display of products at the retail store; it does not inspect store inventory for safety and quality; it does not remove from sale products that fail to meet Trader Joe's standards; and it does not offer its customers the same liberal return policy offered by Trader Joe's. ER89. Indeed, instead of shipping products in temperature-controlled shipping containers, Hallatt uses an unmarked minivan. ER119-20.

Pirate Joe's sale of TRADER JOE'S-branded products outside Trader Joe's quality control structure raises serious concerns that a TRADER JOE'S-branded food product that was improperly handled or stored by Pirate Joe's could harm a

customer. Trader Joe's fears were realized on October 22, 2012, when Trader

Joe's received a phone call from a customer stating that she had purchased a

TRADER JOE'S-branded frozen beef burrito from Pirate Joe's and had become

sick with food poisoning after consuming the product. ER89. The customer

informed Trader Joe's that when she approached Pirate Joe's, it would not take

responsibility or allow her to return the product. *Id.*

### C. The District Court Action

Faced with Hallatt's repeated refusals to stop reselling TRADER JOE'S-

branded products, Trader Joe's filed suit in the Western District of Washington on

May 1, 2013. The Complaint alleged claims against Hallatt under the Lanham Act

for federal trademark infringement, unfair competition, false endorsement, false

designation of origin, false advertising, and trademark dilution, as well as claims

under Washington state law for injury to business reputation by dilution and

deceptive business practices. ER87-94. On June 14, 2013, after two stipulated

extensions of time, Hallatt filed his Answer and a Counterclaim for Trader Joe's

purported "discrimination" on the basis of his Canadian citizenship. ER141-45.

On July 12, 2013, Hallatt amended his Answer and withdrew his

Counterclaim. ER123-32. In his Amended Answer, Hallatt admitted owning and

operating a store in Vancouver, British Columbia, that operates under the name

"Pirate Joe's." ER125. Hallatt also admitted that he and others at his direction

purchased TRADER JOE'S-branded food products from Trader Joe's retail grocery stores in the state of Washington, and that he resold these products in Canada. ER125-27.

In August 2013, shortly after the discovery period began, Hallatt filed a Rule 12(b)(1) motion to dismiss the case for lack of subject-matter jurisdiction. D. Ct. Dkt. No. 25. Hallatt argued that the district court lacked subject-matter jurisdiction over Trader Joe's claims under this Court's precedents concerning extraterritorial application of the Lanham Act. *Id*. at 3-4. Hallatt argued that applying the Lanham Act to his conduct could create a conflict with Canadian law—although he did not identify any specific conflict—and he contended that Canada had a "significant interest" in not seeing the Lanham Act applied. *Id*. at 6. Hallatt acknowledged that he was a U.S. resident alien, but he argued that the Lanham Act should not apply because he operated a "Canadian business" with "no offices in the United States." *Id*. at 7. In addition, he contended that the district court lacked subject-matter jurisdiction over Trader Joe's state law claims because the only basis of federal jurisdiction alleged in the Complaint, federal question jurisdiction, was improper. *Id*. at 9.

On October 2, 2013, the district court granted Hallatt's Rule 12(b)(1) motion, finding that it lacked subject-matter jurisdiction over Trader Joe's Lanham Act claims. ER20-34. The court acknowledged the Supreme Court's holding in

16

*Steele* that the Lanham Act can be applied extraterritorially. ER24-25. But the

court held that extraterritorial application of the Act was restricted by the

"*Timberlane* factors"—the multi-factor test this Court first announced in

*Timberlane Lumber Co. v. Bank of America, N.T. & S.A.*, 549 F.2d 597 (9th Cir.

1976). ER24-25. Construing *Timberlane* as a limitation on the subject-matter

jurisdiction of the federal courts, the court found that Trader Joe's Complaint did

not satisfy the *Timberlane* factors because Trader Joe's had not alleged

*infringement in the United States.* ER25. Because the "allegedly infringing

activities are wholly foreign," the court explained, their effect on Trader Joe's and

U.S. commerce was "relatively insignificant" and "more significant in Canada."

ER29-31.

Although Hallatt never sought dismissal without leave to amend, and even

though Trader Joe's expressly requested leave to amend in its opposition (D. Ct.

Dkt. No. 28 at 18), the court dismissed Trader Joe's Lanham Act claims with

prejudice and without leave to amend. ER20-33. The court held that amendment

would be futile because "[e]ven if Trader Joe's were to bring further allegations to

support a showing of economic harm under the Lanham Act, extraterritorial

jurisdiction would not be supported." ER20-33. The court did, however, grant

Trader Joe's leave to amend its Complaint to allege diversity jurisdiction over

Trader Joe's state law claims. *Id*.

Trader Joe's subsequently filed a First Amended Complaint ("FAC") with allegations of diversity jurisdiction for the state law claims. ER79-109. Trader Joe's also filed a motion for reconsideration of the court's earlier dismissal order, attaching a proposed Second Amended Complaint ("SAC"). D. Ct. Dkt. No. 36 & ER41-109.[1] On October 28, 2013, the court denied Trader Joe's motion. ER13-19.[2]

Thereafter, Hallatt filed a Rule 12(b)(6) motion to dismiss Trader Joe's state law claims in the FAC. D. Ct. Dkt. No. 39. On December 18, 2013, the district court granted the motion and entered a judgment dismissing the action with prejudice. ER1-12. The district court held that Trader Joe's had not stated a claim under state law because Trader Joe's had not alleged dilution occurring within the state of Washington or "any effect on any Washington resident." ER09. Trader Joe's timely appealed. ER34-36.

---

[1] The factual allegations in the FAC are identical to the factual allegations in the proposed SAC. *Compare* ER79-109 *with* ER41-56. The only difference between the two is that the Proposed SAC includes the Lanham Act claims along with the state claims.

[2] Because the district court refused to reconsider its denial of leave to amend, this Court considers the plaintiff's new allegations in analyzing any motion on the pleadings. *See Nat'l Abortions Fed'n v. Operation Rescue*, 8 F.3d 680, 686-87 (9th Cir. 1993). Because the factual allegations in the FAC are identical to the factual allegations in the proposed SAC, Trader Joe's cites to the FAC throughout this brief for simplicity.

Hallatt's infringing activity continues to this day.  Since the filing of the Complaint in this action, Hallatt has made clear through numerous media statements that the ultimate goal of his Pirate Joe's enterprise is nothing less than a formal distributorship agreement from Trader Joe's.  ER119-20, ER122.

## SUMMARY OF ARGUMENT

The district court erred in dismissing Trader Joe's Lanham Act claims.  As a threshold matter, the court erred in concluding it lacked subject-matter jurisdiction over these claims.  Under the federal question statute, 28 U.S.C. § 1331, district courts have subject-matter jurisdiction over all claims arising under federal law, including the Lanham Act.  While Congress may place additional limits on this jurisdiction, it must do so using clear language.  *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 515-16 (2006).  Relying on *Timberlane* and other pre-*Arbaugh* case law, the district court found that the Lanham Act limited its subject-matter jurisdiction over claims with extraterritorial reach.  But nothing in the Lanham Act expresses any congressional intent—much less clear intent—to restrict the subject-matter jurisdiction of federal courts in Lanham Act cases.  On the contrary, through "sweeping" language, Congress extended the Lanham Act to all "commerce within the control of Congress."  15 U.S.C. § 1127.  Whatever territorial limits on the Lanham Act may exist, they are not jurisdictional in nature.  And because the only

basis for Hallatt's motion to dismiss was lack of jurisdiction under Rule 12(b)(1), the district court's dismissal order cannot stand on its own terms.

Nor can the order be affirmed on the alternative ground that Trader Joe's Complaint failed to state a claim under the Lanham Act because of the extraterritorial conduct alleged. That is, even treating the district court's analysis of the *Timberlane* factors as an analysis of the scope of the statute rather than of the court's jurisdiction, the court's interpretation of the Lanham Act and its application of *Timberlane* are inconsistent with controlling Supreme Court precedent.

It is long-settled that the Lanham Act is one of the few statutes that applies to foreign conduct. *See Steele*, 344 U.S. at 287. In *Steele*, the Supreme Court held that the Act applied to claims brought by a U.S. plaintiff against a U.S. defendant even though the alleged infringement occurred in Mexico, where the defendant made legal purchases in the United States in furtherance of his later infringement, and where the harmful effects of the defendant's activity were not confined to Mexico but also felt in the United States. *Id*. The present case is on all fours with *Steele*: a U.S. plaintiff (Trader Joe's) has brought suit against a U.S. defendant (Hallatt, a U.S. resident alien) based on the defendant's conduct in both the United States and Canada and injuries to the plaintiff in both the United States and Canada. The dismissal order cannot be reconciled with *Steele*.

20

Trader Joe's Lanham Act claims also satisfy the multi-factor *Timberlane* test that this Court adopted after *Steele* to determine when the Lanham Act applies extraterritorially in light of international comity concerns. Under *Timberlane,* the Lanham Act applies to wholly extraterritorial conduct so long as the defendant's activity has "some effect on American foreign commerce" and gives rise to a cognizable injury under the Lanham Act, unless the interests in and links to American foreign commerce are weak in relation to those of other nations. The continued viability of the *Timberlane* test is questionable, as is its application to this case. But to the extent the test applies at all, it is easily satisfied here because (1) Trader Joe's has alleged that Hallatt's activity—which occurs not only in Canada, but also in the United States—affects U.S. foreign commerce; (2) Trader Joe's has stated cognizable Lanham Act claims premised on this activity; and (3) there are no international comity concerns at play because this is a dispute between a U.S. plaintiff and a U.S. defendant and there are no parallel adversarial proceedings in Canada between the two parties. The court thus erred in dismissing Trader Joe's Lanham Act claims.

The district court also erred in dismissing Trader Joe's state law claims. As with Trader Joe's federal claims, the district court improperly read territorial limits into Washington's Antidilution Act and Consumer Protection Act. Ignoring the language of the statutes and controlling Washington Supreme Court precedent, the

district court held that Washington's Antidilution Act requires "dilutive activity" in the state of Washington and Washington's Consumer Protection Act's "trade or commerce" language requires "wrongful conduct" occurring in the state of Washington. These constructions are flatly inconsistent with the language of the statutes, which both provide that their interpretation should be guided by federal courts' interpretation of the Lanham Act. The Washington Supreme Court also has repeatedly rejected restrictive readings of the CPA's "trade or commerce" requirement. Contrary to the district court's order, Washington state law can and does apply to activity occurring outside the state of Washington; there is no presumption against extraterritorial application of Washington state law.

## STANDARD OF REVIEW

This Court reviews de novo a district court's grant of a motion to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure. *Viewtech, Inc. v. United States*, 653 F.3d 1102, 1103–04 (9th Cir. 2011). When reviewing a facial attack on subject-matter jurisdiction, this Court assumes the truth of all allegations in the complaint and draws all reasonable inferences in the plaintiff's favor. *Pride v. Correa*, 719 F.3d 1130, 1133 (9th Cir. 2013).

This Court reviews de novo a district court's grant of a Rule 12(b)(6) motion to dismiss for failure to state a claim. *AE ex rel. Hernandez v. Cnty. of Tulare*, 666

F.3d 631, 636 (9th Cir. 2012). Factual allegations of the complaint are accepted as true and construed in the light most favorable to the plaintiff. *Id.* The district court's interpretation of state law is reviewed under the same de novo standard that is used to review questions of federal law. *Conestoga Servs. Corp. v. Exec. Risk Indem., Inc.*, 312 F.3d 976, 981 (9th Cir. 2002).

## ARGUMENT

## I. THE DISTRICT COURT ERRED IN DISMISSING TRADER JOE'S LANHAM ACT CLAIMS

### A. The Lanham Act's Extraterritorial Application Is Not a Question of Subject-Matter Jurisdiction

The district court dismissed the Complaint for lack of subject-matter jurisdiction because it determined the Lanham Act did not extend to the extraterritorial conduct alleged. ER20-33. That was error; the extent of the Lanham Act's extraterritorial scope is purely a question of the statute's own substantive application, not a matter of federal court jurisdiction.

The district court's mistake was understandable. Both this Court and the Supreme Court have—in the increasingly distant past—referred to extraterritoriality under the Lanham Act as implicating the court's "subject-matter jurisdiction." *Steele*, 344 U.S. at 281 n.2; *Ocean Garden, Inc. v. Marktrade Co.*, 953 F.2d 500, 502 (9th Cir. 1991). But as the Supreme Court has more recently made clear, those references arise from a failure to distinguish "two sometimes confused or conflated concepts: federal-court 'subject-matter' jurisdiction over a

23

controversy; and the essential ingredients of a federal claim for relief." *Arbaugh*, 546 U.S. at 503.

The Supreme Court addressed this confusion in *Arbaugh* and sought to "bring some discipline" to the use of the term "jurisdictional." *Henderson ex rel. Henderson v. Shinseki*, 131 S. Ct. 1197, 1202 (2011). In *Arbaugh*, the lower courts had applied long-standing precedent holding that Title VII's limitation to employers with "fifteen or more employees" implicated the court's subject-matter jurisdiction. 546 U.S. at 503, 514-16. The Supreme Court unanimously reversed, holding that Title VII's language addressed only the reach of the statute, not whether courts had subject-matter jurisdiction over the claim. *Id.* at 515-16.

The *Arbaugh* Court discussed at length the distinction between limits on subject-matter jurisdiction and statutory provisions that simply address whether the plaintiff has a valid claim. *Id*. at 510-15. True jurisdictional limits are rare threshold preconditions that Congress intended to make unwaivable and jurisdictional; the vast majority of statutory requirements, on the other hand, are simply elements of the cause of action or procedural requirements. *Id*. Acknowledging that "this Court and others have been less than meticulous" in the use of the term "subject-matter jurisdiction," the Supreme Court explained that numerous opinions had used the label "jurisdictional" without actually examining whether Congress intended to limit the subject-matter jurisdiction of the courts. *Id*.

at 511. The Court characterized these opinions as "'drive-by' jurisdictional rulings" and held these "drive-by" opinions should be afforded "no precedential effect on the question whether the federal court had authority to adjudicate the claim in suit." *Id.* (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 91 (1998)).

*Arbaugh* replaced decades of loose jurisdictional language with a new, clear rule: unless Congress "clearly states" an intent to make a statutory limitation jurisdictional, the restriction is not jurisdictional. *Arbaugh*, 546 U.S. at 515-16; *see also Sebelius v. Auburn Reg'l Med. Ctr.*, 133 S. Ct. 817, 824 (2013) (following *Arbaugh*'s clear-statement requirement); *United States ex rel. Air Control Technologies, Inc. v. Pre Con Indus., Inc.*, 720 F.3d 1174, 1176 (9th Cir. 2013) (same).

Application of this rule to the Lanham Act is straightforward. Congress expressed no intent—and certainly no "clearly stated" intent—to place territorial limits on the subject-matter jurisdiction of federal courts to adjudicate Lanham Act claims. The only "jurisdictional" language in the Lanham Act provides that district courts "shall have original jurisdiction . . . of *all actions arising under this chapter*, without regard to the amount in controversy or to diversity or lack of diversity of the citizenship of the parties." 15 U.S.C. § 1121(a) (emphasis added). Nothing in the statute suggests Congress wanted to make extraterritoriality a jurisdictional

25

limitation. Indeed, as explained below in Section I.B, Congress actually crafted the Lanham Act to apply extraterritorially to actions like the one alleged here. *Steele*, 344 U.S. at 283.

The district court accordingly erred in treating the Lanham Act extraterritoriality issue as a question of subject-matter jurisdiction over Trader Joe's Lanham Act claims. Although pre-*Arbaugh* Ninth Circuit decisions address this issue using "jurisdictional" language, this Court has repeatedly held that similar references are no longer good law after *Arbaugh*. *See*, *e.g.*, *Pre Con Indus.*, 720 F.3d at 1176-78 (overruling circuit precedent that treated statute of limitations as jurisdictional, because after *Arbaugh* that rule was "clearly irreconcilable with intervening higher authority"); *Kwai Fun Wong v. Beebe*, 732 F.3d 1030, 1035-38, 1072 (9th Cir. 2013) (citing *Arbaugh* in holding Federal Tort Claims Act's statute of limitations is not jurisdictional); *Leeson v. Transamerica Disability Income Plan*, 671 F.3d 969, 979 (9th Cir. 2012) (citing *Arbaugh* in holding that whether a plaintiff is a plan participant for purposes of ERISA is not jurisdictional). The Court should do the same here, and hold that under *Arbaugh*, extraterritoriality is a substantive question about scope of the statute, not a jurisdictional question about the power of the courts. As such, the district court's order dismissing the Complaint for lack of subject-matter jurisdiction must be reversed.

**B. The District Court's Extraterritoriality Analysis Is Also Incorrect on the Merits**

The district court's erroneous jurisdictional dismissal cannot be salvaged by treating the court's extraterritoriality analysis as a substantive dismissal. Congress drafted the Lanham Act to have "sweeping" reach, and the Supreme Court has specifically held that the Act applies even when all infringing conduct occurs in a foreign country. In addition, the *Timberlane* factors support the application of the Lanham Act to the conduct here—even though those factors, to the extent they are still viable, are best understood as a test of comity more appropriately applied at a later stage of the litigation.

**1. The Supreme Court's Decision in *Steele* Makes Clear That the Lanham Act Extends to the Conduct Alleged**

As a general matter, statutes are presumed to apply only to conduct occurring within the United States. *See Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 253-54 (2010). But the Lanham Act is one of the few statutes that Congress specifically extended beyond the borders of this country. *Steele*, 344 U.S. at 283, 286.

Even before the Lanham Act was enacted in 1946, U.S. courts had held that federal trademark law applied extraterritorially, as the 1881 Federal Trade-Mark Act prohibited infringement occurring "in commerce with foreign nations or with Indian tribes." *E.g.*, *George W. Luft Co. v. Zande Cosmetic Co.*, 142 F.2d 536, 541

(2d Cir. 1944) (affirming in part injunction barring activity in foreign countries); *Vacuum Oil Co. v. Eagle Oil Co. of N.Y.*, 154 F. 867 (N.J. Cir. 1907) (U.S. trademark law applied to infringing activity occurring in Germany). With the Lanham Act, Congress extended the reach of the statute to all "commerce *within the control of Congress.*" 15 U.S.C. § 1127 (emphasis added).[3] And Congress, of course, has broad power "[t]o regulate commerce with foreign nations, and among the several states." U.S. Const. art. 1, § 8; *see Steele*, 344 U.S. at 282 ("Congress in prescribing standards of conduct for American citizens may project the impact of its laws beyond the territorial boundaries of the United States.").

Six years after the enactment of the Lanham Act, the Supreme Court in *Steele* acknowledged that the Act's "sweeping reach" was designed to apply extraterritorially. 344 U.S. at 283, 286. The plaintiff in *Steele* produced and sold BULOVA-branded watches in the United States under a valid U.S. trademark registration. *Id*. at 281, 284. The defendant purchased watch parts in the United States and Mexico, then assembled and sold the watches bearing the BULOVA mark in Mexico City. *Id*. at 285. The plaintiff brought suit in federal court,

---

[3] A useful comparison is to the Patent Act, which expressly limits liability to those who make, use, offer to sell, or sell a patented invention "within the United States." 35 U.S.C. § 271(a). The Lanham Act includes no such limit. 15 U.S.C. § 1125(a)(1) (defendant who infringes trademark through "use in commerce" is liable under Lanham Act); *see also* 5 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 29:57 (4th ed. 2012) (Lanham Act's reach is "considerably broader than that of the patent and copyright laws").

alleging that it was harmed by these sales in Mexico based on, *inter alia*, complaints that it had received from customers who purchased watches in Mexico. *Id*.; *see also Bulova Watch Co. v. Steele*, 194 F.2d 567, 571 (5th Cir. 1952). The district court dismissed the case after hearing evidence because the defendant had committed no illegal acts in the United States and all the infringing activity occurred in Mexico. *Steele*, 344 U.S. at 282. The court of appeals reversed, and the Supreme Court affirmed, holding that the Lanham Act did govern infringing conduct committed in Mexico. *Id*. at 284-85.

The Supreme Court began by acknowledging the general principle that "the legislation of Congress will not extend beyond the boundaries of the United States unless a contrary legislative intent appears," but concluded that Congress *had* intended the Lanham Act to apply more broadly. *Id*. The Court explained that the defendant's activities

> were not confined within the territorial limits of a foreign nation. He bought component parts of his wares in the United States, and spurious "BULOVAS" filtered through the Mexican border into this country; his competing goods could well reflect adversely on [plaintiff's] trade reputation in markets cultivated by advertising here as well as abroad.

*Id*. at 286. Given this, it was not material that the defendant "affixed the mark 'BULOVA' in Mexico City rather than here," nor did it matter that the defendant's activities in the United States, "when viewed in isolation," did not violate U.S. law. *Id*. at 287.

29

In the sixty years since *Steele* was decided, U.S. courts have routinely applied its holding and analysis to enjoin wholly extraterritorial infringing conduct under the Lanham Act. For example, courts have enjoined the sale of infringing cans of abalone that were harvested and packaged in Mexico and sold to consumers in Asia, *Ocean Garden*, 953 F.2d at 503; the use of the words "Scotch Whisky" on spirits mixed, bottled, and sold exclusively in Panama, *Scotch Whiskey Ass'n v. Barton Distilling Co.*, 489 F.2d 809, 813 (7th Cir. 1973); the use of a mark on rice packages sold in Saudi Arabia, *American Rice, Inc. v. Arkansas Rice Growers Co-op. Ass'n*, 701 F.2d 408, 412-14 (5th Cir. 1983); and the use of a U.S.-registered trademark at a trade show in Singapore by a Canadian defendant, *Basis International Ltd. v. Research in Motion Ltd.*, 827 F. Supp. 2d 1302, 1306 (D.N.M. 2011). The Supreme Court itself also has repeatedly reaffirmed *Steele*'s holding as to the Lanham Act's sweeping extraterritorial scope while analyzing *other* statutes that *lack* such broad scope. *See, e.g.*, *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 252 (1991) (noting the "sweeping reach" of the Lanham Act and explaining "the Court in *Steele* concluded that Congress intended that the statute apply abroad"); *Morrison*, 561 U.S. at 271 n.11 (noting that the Court has interpreted the Lanham Act to apply extraterritorially).

*Steele* controls the result here. Like the defendant in *Steele*, Hallatt bought "his wares in the United States," he sold the infringing products over the border,

and his sales resulted in customer complaints that impacted Trader Joe's business in the United States. *See Steele*, 344 U.S. at 286. As in *Steele*, Pirate Joe's improper storage and handling of goods "could well reflect adversely on" Trader Joe's "trade reputation in markets cultivated by advertising here as well as abroad." *Id.*; ER91-93 (alleging that Hallatt's unauthorized resale "outside of Trader Joe's strict quality-control standards" created a material risk that consumers will be harmed by resold TRADER JOE'S-branded products, and noting that at least one customer had become ill from consuming products resold by Hallatt). As in *Steele*, it makes no difference that Hallatt's resale of the goods occurred in Canada, or that "his purchases in the United States when viewed in isolation do not violate any of our laws." 344 U.S. at 287. Hallatt's activities in the United States—most notably obtaining goods from Trader Joe's stores—were "essential steps in the course of business consummated abroad"; those acts thus lose their legal character because they are part of Hallatt's "unlawful scheme." *Id.*

For these reasons, the Complaint properly states a claim for relief under the Lanham Act despite Hallatt's activity in Canada. This case presents no international comity concerns—it is a dispute between a U.S. company and a U.S. resident alien about a course of conduct that depends on the defendant's activity in the United States. Canada has never acknowledged Hallatt's rights in the TRADER JOE'S mark, nor is there a pending adversarial proceeding between

31

the parties in Canada.  Because venue is proper and the district court can exercise

personal jurisdiction over all parties, this claim can be adjudicated under the

Lanham Act.

### 2.     The Viability of the *Timberlane* Factors Is Questionable

The district court dismissed the Complaint after applying a three-factor

test—the "*Timberlane* factors"—to evaluate the extraterritorial application of the

Lanham Act.  ER24-31.  It is not at all clear whether the *Timberlane* test remains

viable on its own terms.  The test was first devised for antitrust cases, and it has

since been abandoned in that context.  *See McGlinchy v. Shell Chem. Co.*, 845 F.2d

802, 814 (9th Cir. 1988) (*Timberlane* superseded by statute).  The test also was

devised as a method for determining the limits of subject-matter jurisdiction, rather

than the substantive scope of the statute, but concerns about the limited reach of

judicial power are no longer at issue.  *Arbaugh*, 546 U.S. at 515-16; Section I.A,

*supra*.  And while *Timberlane* may be best understood as a "rule of reason" that is

grounded in principles of "international comity," the Supreme Court has never

endorsed the practice of dismissing claims at the pleadings stage due to such

comity concerns.  *See Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 797-98

(1993) (holding that district court erred in dismissing claims under *Timberlane*

without reaching question of whether *Timberlane's* comity analysis is proper).

This Court accordingly should hold that *Timberlane* is no longer controlling

precedent—at least because of the Supreme Court's intervening decision in

*Arbaugh*—and because *Steele* itself provides a sufficient basis for determining

whether and when the Lanham Act may be applied to a complaint involving

extraterritorial conduct.

### 3. Even If the *Timberlane* Factors Are Appropriate in Certain Lanham Act Cases, They Do Not Apply Here

Even assuming the *Timberlane* factors remain a viable tool for evaluating

extraterritoriality concerns in the Lanham Act context, they should not be applied

in this case, for two reasons. First, this Court has never applied *Timberlane* at the

pleadings stage—*i.e.*, by affirming dismissal of a Lanham Act claim on

extraterritorial grounds under Rule 12(b). Nor should it do so now, because

*Timberlane* is best understood as a means for evaluating whether certain *remedies*,

such as injunctive relief barring foreign activity, are appropriate under principles of

international comity and equity. *See, e.g.*, *Reebok Int'l, Ltd. v. Marnatech Enters.,*

*Inc.*, 970 F.2d 552, 557-59 (9th Cir. 1992) (using *Timberlane* to evaluate whether

injunction with extraterritorial effect was proper under 15 U.S.C. § 1116(a) given

its language permitting injunctions "according to the principles of equity"); *Star-*

*Kist Foods, Inc. v. P.J. Rhodes & Co.*, 769 F.2d 1393, 1395 (9th Cir. 1985) (using

*Timberlane* to evaluate scope of relief available, as well as proper scope of

discovery, in light of that scope of relief).

Second, the *Timberlane* factors were designed to evaluate conduct that is *wholly extraterritorial*—hence its factor requiring that the conduct have some effect on American *foreign commerce*. *Ocean Garden*, 953 F.2d at 504-05. Where, as here, a defendant's activity both occurs in and directly affects U.S. *domestic commerce*, there is no need to apply *Timberlane*, as there is no question that Congress intended the Lanham Act to govern domestic activity and its effects. For example, in *Ocean Garden*, the plaintiff alleged that the defendant infringed its U.S.-registered trademark by using it on abalone canned in Mexico and sold in Asia. Even though the alleged customer confusion occurred only in Asia, this Court held that a *Timberlane* analysis was unnecessary because the allegedly infringing goods bore a trademark that was registered under the Lanham Act and passed through a U.S. foreign commerce trade zone in Los Angeles en route to Asia. *Id*. at 504-06. As in *Ocean Garden*, a *Timberlane* analysis is unnecessary here because Hallatt's infringing scheme starts with, and wholly depends on, his purchases of goods in the United States for resale in Canada. Because the scheme directly involves U.S. domestic commerce, there is no need to consider whether Hallatt's activity has "some effect" on U.S. foreign commerce. *See Reebok Int'l Ltd. v. Marnatech Enters., Inc.*, 737 F. Supp. 1515, 1518 (S.D. Cal. 1989) (no need to apply *Timberlane* when defendant's activities in the United States constitute

"essential steps in the court of business consummated abroad") *(quoting Steele*, 344 U.S. at 287).

### 4. The *Timberlane* Factors Are Easily Satisfied Here

Although there is good reason to doubt both the viability of the *Timberlane* factors and their applicability to this case, the factors are easily met here. Under *Timberlane*, the Lanham Act governs conduct where (1) the defendant's action creates "some effect on American foreign commerce"; (2) this effect presents a "cognizable injury to plaintiffs under the [Lanham Act]"; and (3) "the interests of and links to American foreign commerce [are] sufficiently strong in relation to those of other nations to justify an assertion of extraterritorial authority." *Reebok*, 970 F.2d at 554.

### a. Pirate Joe's Actions Affect American Foreign Commerce and Cause Trader Joe's Cognizable Injury Under the Lanham Act

The first two *Timberlane* factors, which courts typically address jointly, merely require (1) "some effect on American foreign commerce" that presents a (2) "cognizable injury to Plaintiff" under the Lanham Act. *Reebok*, 970 F.2d at 554. This effect on American foreign commerce need not be "substantial"; all that is needed is "some effect." *Wells Fargo & Co. v. Wells Fargo Express Co.*, 556 F.2d 406, 428 (9th Cir. 1977) (rejecting any requirement that the effect be "substantial"). This is an exceedingly low threshold; this Court has found it

satisfied by bare allegations that the defendant's foreign activity violates a U.S. plaintiff's rights under the Lanham Act, thereby causing injury to that plaintiff in the United States. *See Ocean Garden*, 953 F.2d at 503, *Star-Kist Foods*, 769 F.2d at 1395.

As alleged in Trader Joe's Complaint, Hallatt's activity occurs in and affects U.S. foreign commerce and causes Trader Joe's cognizable injury under the Lanham Act. Hallatt infringes and dilutes the famous TRADER JOE'S trademark and family of marks by selling TRADER JOE'S-branded food products that have not been handled and stored pursuant to Trader Joe's quality control practices. ER153-56. As a consequence, these goods are not "genuine" TRADER JOE'S-branded goods, and Hallatt's sale of them is likely to confuse customers, tarnish the famous TRADER JOE'S mark, and damage the goodwill associated with Trader Joe's and its marks. *Enesco Corp. v. Price/Costco Inc.*, 146 F.3d 1083, 1087 (9th Cir. 1998); *Hokto Kinoko Co. v. Concord Farms, Inc.*, 738 F.3d 1085, 1094 (9th Cir. 2013).

Trader Joe's has no control over how Pirate Joe's handles, stores, or ships its products, and thus customers are at serious risk of receiving TRADER JOE'S-branded products that do not meet Trader Joe's exacting quality standards. Because a customer who receives a defective product from Pirate Joe's would not be able to tell whether the defect is the fault of Trader Joe's, the customer would

likely view Trader Joe's less favorably, causing harm to the reputation and

goodwill that Trader Joe's has carefully cultivated over the past 40 years. ER151-

53. This harm would occur not only in Canada but also in the United States

because food safety issues are national, and even international, news.[4] Reports of

food safety issues with TRADER JOE'S-branded products sold by Hallatt would

inevitably travel back to the United States, where it would injure Trader Joe's

reputation and goodwill.[5]

Additionally, Hallatt infringes and dilutes Trader Joe's famous, registered

service mark TRADER JOE'S by offering retail grocery services under the

confusingly similar mark "Pirate Joe's." ER154-55. Hallatt also commits trade

dress infringement by operating a grocery store decorated with Trader Joe's

famous, South Pacific-inspired trade dress. ER156-58; *see Two Pesos, Inc. v. Taco*

*Cabana, Inc.*, 505 U.S. 763, 767-69 (1992) (Lanham Act protects unregistered

---

[4] For example, issues concerning the ingredients of Swedish meatballs sold in Ikea's European stores were national news in the United States. *See* Andrew Wiggens, *Ikea Recalls Meatballs After Detection of Horse Meat*, N.Y. Times, Feb. 25, 2013, at A4 (http://www.nytimes.com/2013/02/26/world/europe/ikea-recalls-itsmeatballs-horse-meat-is-detected.html).

[5] For the purposes of this brief, Trader Joe's accepts as true Hallatt's claim that he acquired *all* of the products he sells by purchasing them from Trader Joe's stores at retail price. Given the subterfuge Hallatt has engaged in to acquire products after Trader Joe's refused to sell to him, however, it is possible that discovery will reveal that not all the products were purchased at retail prices from Trader Joe's stores.

trade dress). These infringing acts intentionally give customers the false impression that they are purchasing the goods from an authorized seller.

Each of these activities affects U.S. commerce, because it injures Trader Joe's—a U.S. corporation. *E.g.*, *Ocean Garden*, 953 F.2d at 503, *Star-Kist Foods*, 769 F.2d at 1395. Trader Joe's claims against Hallatt are well recognized under the Lanham Act. *See Enesco Corp.*, 146 F.3d at 1087; *Two Pesos*, 505 U.S. at 767-69. Even Hallatt acknowledged that "the merits of Plaintiff's trademark claims are not at issue." D. Ct. Dkt. No. 30 at 3 n.1. Yet the district court held that the *Timberlane* factors were not satisfied because *Timberlane* required a showing of "economic harm," and Trader Joe's could not make this showing because Hallatt's products were "purchased at Trader Joe's at retail price." ER26.

That analysis is flawed in multiple respects. First, the court erred by requiring a specific "showing" of economic harm at the pleading stage. The Complaint's allegations of economic harm resulting from Hallatt's infringing activities must be presumed true. *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). Nothing in the Lanham Act, Rule 12(b)(6), *Steele*, or *Timberlane* supports a heightened pleading requirement for actual economic loss to justify application of the Act to a claim involving foreign conduct.

Second, the district court's demand for a "showing" of economic loss is directly contrary to the fundamental trademark-law rule that "it is *not* necessary for

plaintiff to prove actual damage or injury to state a prima facie case of infringement." 5 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 30:2 (4th ed. 2012) (emphasis added). This is because the "injury" in a trademark action is the infringing or dilutive act itself, which denies the mark's owner control over its own mark. *Id*.; *see Safeway Stores, Inc. v. Rudner*, 246 F.2d 826, 829 (9th Cir. 1957); *Hypertherm, Inc. v. Precision Prods., Inc.*, 832 F.2d 697, 700 (1st Cir. 1987).

Accordingly, there is no basis for requiring Trader Joe's to prove—at the *pleading* stage, no less—the extent of its lost sales or other concrete economic injury resulting from Hallatt's unlawful conduct. Moreover, while a plaintiff's lost profits are *one* of the remedies available under the Lanham Act, *see* 15 U.S.C. § 1117(a), there are many other forms of relief available under the Act to address a trademark injury. Section 1117(a) also permits disgorgement of the defendant's profits, *see Maier Brewing Co. v. Fleischmann Distilling Corp.*, 390 F.2d 117, 123-24 (9th Cir. 1968), and awards of the plaintiff's damages based on injury to goodwill or reputation, *see Skydive Ariz., Inc. v. Quattrocchi*, 673 F.3d 1105, 1112 (9th Cir. 2012). This Court has held that § 1117(a) "confers a wide scope of discretion upon the district judge in fashioning a remedy" and "demands neither empirical quantification nor expert testimony to support a monetary award of actual damages." *Id*. at 1113.

Here, Hallatt is free-riding on Trader Joe's reputation and goodwill and damaging it in the process: he is selling TRADER JOE'S-branded food products, but he is not storing or handling those products in the manner Trader Joe's customers have come to expect. He is also using a name—Pirate Joe's—that was selected to trade off the goodwill of the famous TRADER JOE'S mark. And he is selling goods through a store having a physical appearance evocative of Trader Joe's distinctive trade dress. For these reasons, Trader Joe's is entitled to recover, at the very least, Hallatt's ill-gotten profits, damages reflecting Trader Joe's loss of goodwill, and a permanent injunction—the Lanham Act's "remedy of choice." *Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1180 (9th Cir. 1988).

Trader Joe's has alleged significant reputational harm; the district court either erred in failing to accept those allegations as true or, if it found those allegations to be insufficiently supported, erred in denying Trader Joe's leave to amend to allege additional facts concerning the likely impact on Trader Joe's reputation of a potential food safety scare caused by Hallatt's mishandling of TRADER JOE'S-branded food products.[6] If left to stand, the district court's

---

[6] This Court has made clear that leave to amend should be granted "even if no request to amend the pleading was made, unless [the district court] determines that the pleading could not possibly be cured by the allegation of other facts." *Lacey v. Maricopa Cnty.*, 693 F.3d 896, 926 (9th Cir. 2012) (en banc); *see Carolina Cas. Ins. Co. v. Team Equip., Inc.*, 741 F.3d 1082, 1086 (9th Cir. 2014) (district court abuses its discretion in dismissing without leave to amend unless amendment would be futile).

dismissal order would deny Trader Joe's *any* relief under the Lanham Act for this free-riding, injurious behavior merely because Hallatt allegedly pays retail price for the goods he resells in his unlawful, infringing scheme. This result would upend this Court's instruction that "it is essential that the trial courts carefully fashion remedies which will take all the economic incentive out of trademark infringement." *Playboy Enters., Inc. v. Baccarat Clothing Co.*, 692 F.2d 1272, 1275 (9th Cir. 1982).

The district court's analysis of the first and second *Timberlane* factors relied primarily on *Love v. Associated Newspapers*, *Ltd.*, 611 F.3d 601 (9th Cir. 2010)—the *only* case in which this Court has ever found *Timberlane*'s first two factors not satisfied. *Love*, a summary-judgment action involving review of actual evidence, has no application here. *Love* involved a dispute between founding Beach Boys members Mike Love and Brian Wilson regarding a promotional CD manufactured in Germany and distributed only in the United Kingdom and Ireland. The CD was released by Wilson, but the CD's artwork included a photo of Love and other members of the Beach Boys who had not participated in its recording. Love brought suit in California bringing Lanham Act claims of unfair competition against Wilson and various foreign entities and individuals associated with the production and distribution of the CD. The court granted summary judgment for the defendants because the only evidence Love produced that the CD could have

ever made it into or affected U.S. commerce was his own "speculative" declaration that Wilson's promotional CD "increased demand for Wilson's concerts, which in turn decreased demand for Plaintiff's concerts." *Love v. Mail on Sunday*, 473 F. Supp. 2d 1052, 1056 (C.D. Cal. 2007).

*Love*'s grant of summary judgment based on the plaintiff's failure of proof does not support dismissal of this action on the pleadings. At the most basic level, because the district court dismissed Trader Joe's Complaint under Rule 12(b)(1), there has been no opportunity to develop the evidence here. Further, in *Love* it was "undisputed that all relevant acts occurred abroad," including the conception of the idea for the promotional CD, the production of the promotional CD, and the distribution of the promotional CD. 611 F.3d at 613. Here, Hallatt's conduct is admittedly *not* wholly extraterritorial—Pirate Joe's entire unlawful scheme relies on the purchase of goods from Trader Joe's stores in the United States. And at the pleading stage of this case, the Court is required to accept as true Trader Joe's allegations that Pirate Joe's infringing and dilutive activity causes harm to Trader Joe's goodwill and reputation in the United States—a clear impact on U.S. commerce.

### b. The Third *Timberlane* Factor Also Favors Jurisdiction

While the first two *Timberlane* factors are "substantially intertwined with the merits" of the plaintiff's claim—i.e., whether the plaintiff has stated a claim—

the third *Timberlane* factor addresses whether, "as a matter of international comity and fairness," the Lanham Act *should* apply. *Metro Indus., Inc. v. Sammi Corp.*, 82 F.3d 839, 846-47 (9th Cir. 1996); *Timberlane*, 549 F.2d at 615. Under the third factor, courts consider seven sub-factors:

> the degree of conflict with foreign law or policy, the nationality or allegiance of the parties and the locations or principal places of business of corporations, the extent to which enforcement by either state can be expected to achieve compliance, the relative significance of effects on the United States as compared with those elsewhere, the extent to which there is explicit purpose to harm or affect American commerce, the foreseeability of such effect, and the relative importance to the violations charged of conduct within the United States as compared with conduct abroad.

*Reebok*, 970 F.2d at 555.

Each factor need not be shown; rather, "each factor is just one consideration to be balanced" in *Timberlane*'s analysis of comity and fairness. *Wells Fargo*, 556 F.2d at 428. Like *Timberlane*'s first two factors, its third factor does not present a high bar to the extraterritorial application of the Lanham Act. This Court has found *Timberlane*'s third factor to support extraterritorial application of the Lanham Act even when there were no allegations that the defendant's activity was causing confusion in the United States, *Ocean Garden*, 953 F.2d at 503-04, and even when there was pending litigation between the parties in a foreign nation, *Reebok*, 970 F.2d at 555-56. In fact, this Court has declined to apply the Lanham Act extraterritorially due to comity concerns raised under the third *Timberlane*

43

factor only once, in *Star-Kist*, 769 F.2d at 1395; as discussed more fully below, that case is inapposite and only partially barred extraterritorial application of the Lanham Act.

Here, there is no conflict between extraterritorial application of the Lanham Act and the interests of any foreign state.

### (i) There Is No Conflict with Canadian Law or Policy

The first sub-factor is "the degree of conflict with foreign law or policy." *Reebok Int'l Ltd. v. McLaughlin*, 49 F.3d 1387, 1390 n.2 (9th Cir. 1995) ("*McLaughlin*"). In the sole case in which this Court found this factor to weigh against extraterritorial application of the Lanham Act, there was a pending adversarial proceeding between the parties in the foreign country over the defendant's rights in the mark. *Star-Kist*, 769 F.2d at 1395. Because the defendant had already commenced an action to cancel the plaintiff's trademark registration with the Philippine Patent Office, this Court upheld the district court's decision not to evaluate whether the defendant had rights in the mark in the Philippines. *Id*. The Court noted that because of this pending adversarial proceeding, a district court adjudication of the respective rights of the plaintiff and defendant to the mark in the Philippines "could create a conflict with Philippines patent and trademark law and with pending proceedings in that country." *Id*. at 1396.

Here, Hallatt has acquired no foreign trademark registrations, nor is there any pending adversarial proceeding.  The district court incorrectly emphasized the fact that Trader Joe's—not Hallatt—has two trademark applications pending in Canada.  ER28.  Those applications do not constitute an adversarial proceeding between the parties.  While Canadian law, like U.S. law, allows for opposition of a trademark application,[7] Hallatt has never availed himself of this process.  It is too late for him to do so now, because the Canadian Intellectual Property Office issued notices of allowances for both of Trader Joe's applications in 2012.  ER71-74.

### (ii) Hallatt, a U.S. Permanent Resident Alien, Conducts Business in the United States

The second sub-factor is "the nationality or allegiance of the parties and the locations or principal places of business of corporations."  *McLaughlin*, 49 F.3d at 1390 n.2.  The district court correctly found that this factor favored Trader Joe's because Hallatt had U.S. permanent resident alien status and it was "undisputed Hallatt makes frequent trips to the U.S. to purchase products at Trader Joe's to sell at Pirate Joe's."  ER29; *see also Reebok*, 970 F.2d at 554.

### (iii) The Court Has Many Options in Ensuring Hallatt Complies with Court Orders

The third sub-factor is "the extent to which enforcement by either state can be expected to achieve compliance."  *McLaughlin*, 49 F.3d at 1390 n.2.  It will not

---

[7] *See* Trade-Marks Act, R.S.C. 1985, c. T-13 § 38 (opposition proceeding in Canada); 15 U.S.C. § 1062(a) (opposition proceeding in the United States).

be difficult for the district court to enforce a judgment against Hallatt.  As even the district court conceded, "[c]ompliance is easily achieved when a U.S. company or individual is doing the alleged infringing."  ER29.  The fact that Hallatt is a permanent U.S. resident alien, rather than a U.S. citizen, makes no difference:  the United States holds U.S. resident aliens to the same standard as its citizens.  In addition, Canadian courts regularly enforce U.S. judgments, including judgments containing injunctive relief.  *Pro Swing Inc. v. Elta Golf Inc.*, [2006] 2 S.C.R. 612 (Can.).  And even if the court were concerned about the challenge of enforcing an injunction in Canada, it could avoid these issues by crafting the injunction to bar Hallatt's activity in the United States, where Hallatt and his associates buy the products and export them to Canada.  *See Star-Kist*, 769 F.2d at 1394 (affirming injunction barring defendant from using trademark on products "sold within the United States or exported from the United States").

The district court found that this factor weighed against extraterritorial application of the Lanham Act, improperly recasting it as evaluating "how strong a foreign defendant's presence is in the United States."  ER29.  There is no support in the law for the district court's reinterpretation of this factor.  This factor means what it says, and the district court has many options in achieving compliance.  But even as reinterpreted by the district court, this sub-factor favors application of the Lanham Act.  As a U.S. resident alien, Hallatt is *required* to maintain a permanent

46

residence in the United States. *See* U.S. Citizenship & Immigration Servs., "Maintaining Permanent Residence," at http://www.uscis.gov/green-card/after-green-card-granted/maintaining-permanent-residence (visited May 21, 2014). Hallatt has also admitted to hiring people in the state of Washington to purchase TRADER JOE'S-branded products for him, giving him an even stronger "presence" in the United States. D. Ct. Dkt. No. 39 at 10-11; *see Ocean Garden*, 953 F.3d at 504 (third sub-factor favored application of Lanham Act because defendant "orchestrated" activities from the United States).

### (iv) Pirate Joe's Conduct Significantly Affects U.S. Commerce

The fourth sub-factor is "the relative significance of effects on the United States as compared with those elsewhere." *McLaughlin*, 49 F.3d at 1390 n.2. The district court found that this factor weighed against extraterritorial application of the Lanham Act because, "even if the Court were to assume that there is some diversion of business or reputational impact," it would still be true that "Pirate Joe's is paying market price for Trader Joe's food and re-selling it in Canada." ER30. As already shown, the court's myopic focus on the retail prices Hallatt paid misunderstands the fundamental principle of injury to the plaintiff—and hence effects on the plaintiff—under the Lanham Act. *See supra* Section I.B.a. Further, this Court has found the "relative effects" sub-factor to favor extraterritorial

application of the Lanham Act when the plaintiff is a U.S. corporation. *Ocean Garden*, 953 F.2d at 504.

### (v)  Hallatt Purposely Affects U.S. Commerce

The fifth sub-factor is "the extent to which there is explicit purpose to harm or affect American commerce." *McLaughlin*, 49 F.3d at 1390 n.2.  Courts routinely apply the Lanham Act to extraterritorial conduct without even examining this factor. *See, e.g.*, *Reebok*, 970 F.2d at 557.  It is enough for the plaintiff merely to *allege* that the defendant's activity was "purposeful and deliberate." *Wells Fargo*, 556 F.2d at 429.  Here, Pirate Joe's continued its activity and adopted the name "Pirate Joe's" after Trader Joe's demanded it cease and desist, which suggests a calculated and deliberate attempt to trade on Trader Joe's reputation. Furthermore, Hallatt has made clear through numerous media appearances that he seeks nothing less than a formal distributorship agreement from Trader Joe's. ER110-11, ER119-20, ER122.  Pirate Joe's explicit purpose is to affect U.S. commerce by parlaying infringement into a legitimate business relationship with a U.S. company.

### (vi)  Hallatt's Effect on U.S. Commerce Was Foreseeable

The sixth sub-factor is the foreseeability of the effect on U.S. commerce. *McLaughlin*, 49 F.3d at 1390 n.2.  Here, Pirate Joe's received notice of Trader Joe's position before this action was filed. ER114-15.  Instead of ceasing activity,

it doubled-down by adopting the name "Pirate Joe's."  It was entirely foreseeable that by selling TRADER JOE'S-branded goods outside Trader Joe's quality control structure, the goodwill and reputation of a U.S. company would be hurt in the United States.  *See, e.g.*, *Reebok*, 970 F.2d at 557 ("undeniabl[y]" foreseeable that defendant's products sold in Mexico border towns would damage plaintiff's brand in the United States).

### (vii)   The "Relative Importance" Factor Favors Trader Joe's

The final sub-factor is "the relative importance to the violations charged of conduct within the United States as compared with conduct abroad."  *McLaughlin*, 49 F.3d at 1390 n.2.  This factor has been found to favor extraterritorial jurisdiction even when all conduct occurred outside the U.S. and no infringing items entered the U.S., simply because the plaintiff is a "U.S. corporation and is hurt by the infringement."  *Ocean Garden*, 953 F.2d at 504.  As discussed above, Trader Joe's is a U.S. company that has been and will continue to be injured by Pirate Joe's infringement.

In sum, each of the *Timberlane* factors supports application of the Lanham Act, and Hallatt has suggested no comity concerns that could be affected by adjudication of this dispute.

49

## II.   THE DISTRICT COURT ERRED IN DISMISSING TRADER JOE'S STATE LAW CLAIMS

The district court also dismissed both of Trader Joe's state law claims with prejudice and without leave to amend.  ER2-12.  The court concluded that Washington's Antidilution Act, RCW § 19.77.160, applies only to the use of marks within the state of Washington, and that Washington's Consumer Protection Act, RCW § 19.86.020, reaches only unfair competition occurring within the state of Washington.  ER7-10.  That conclusion ignores the language of the statutes, Washington Supreme Court case law, relevant federal case law on the Lanham Act, and all other sources of guidance.  That decision should also be reversed.

### A.   The District Court Erred in Dismissing Trader Joe's State Law Dilution Claim

The district court interpreted Washington's Antidilution Act to require "diluting activity within the state of Washington" and concluded that Trader Joe's had failed to allege such in-state "diluting activity."  ER7-9.  That interpretation is facially incorrect:  Washington's Antidilution Act requires *dilution* in Washington, not "diluting activity" in Washington.  And nothing in the statute suggests this protection is limited to only dilution caused by a defendant's use of a mark within the state.

The language of Washington's Antidilution Act closely follows the language of the federal dilution statute.  *Compare* RCW § 19.77.160 *with* 15 U.S.C.

§ 1125(c)(1). It departs from the Lanham Act—which protects famous marks—to require that the plaintiff's mark be famous "in this state." RCW § 19.77.160(1); *see also* RCW § 19.77.160(1)(a), (c) (revising Lanham Act's factors for determining fame of a mark to include "the degree of inherent or acquired distinctiveness of the mark *in this state*" and "the duration and extent of advertising and publicity of the mark *in this state*" (emphasis added)). And while the federal statute entitles the mark holder to an injunction barring the defendant's "use in commerce" of the dilutive mark, the state statute entitles the mark holder to an injunction of use "in this state." 15 U.S.C. § 1125(c)(1); RCW § 19.77.160(1). However, both statutes permit the mark holder to obtain additional remedies upon a showing that the defendant "willfully intended to trade on the owner's reputation or to cause dilution of the owner's mark." 15 U.S.C. § 1125(c)(2); RCW § 19.77.160(2). Therefore, while Washington's Antidilution Act only protects marks that are famous in Washington and limits the geographic scope of the injunction to which the prevailing plaintiff is entitled, it does not require a showing that the defendant *used* the infringing mark in Washington, nor does it limit damages to use occurring in Washington. If the legislature wanted the act to be so limited, it could have easily written the statute that way. But it did not.

There is no Washington state case law supporting the district court's restrictive reading of the statute. Rather than impose any territorial limits on the

statute, Washington cases address claims involving foreign conduct as a choice-of-law issue. *See, e.g.*, *Haberman v. Wash. Public Power Supply Sys.*, 744 P.2d 1032, 1053-54 (Wash. 1987) ("[T]he question before us is whether the [state statute] applies in an action brought in a Washington forum where out-of-state parties are under this State's jurisdiction. As a result, choice of law principles govern our analysis"); *Experience Hendrix LLC v. James Marshall Hendrix Found.*, 240 F. App'x 739 (9th Cir. 2007) (treating extraterritorial application of Washington state law as choice-of-law issue); *Gund v. Philbrook's Boatyard*, 374 F. Supp. 2d 909, 914 (W.D. Wash. 2005) (same). Under this analysis, the first step is to determine whether an actual conflict exists. *Experience Hendrix*, 240 F. App'x at 740 (citing Restatement (Second) of Conflict of Laws § 6 (1971) and *Seizer v. Sessions*, 940 P.2d 261, 263 (Wash. 1997)). Only if there is an actual conflict does the court determine which jurisdiction has the "most significant relationship" to the issue. *Id*.

Despite having numerous opportunities to do so, Pirate Joe's never identified any conflict between the law of Washington and Canada. And even if there were such a conflict and if the Court found that Canadian law should apply, the proper result would be for the district court to apply Canadian law instead of the law of Washington—not to require Trader Joe's to commence a new lawsuit in Canada. *See Experience Hendrix*, 240 F. App'x at 740 (applying New York state law to

Washington statutory claim); *see also Intelsat USA Sales Corp. v. Juch-Tech, Inc.*, 935 F. Supp. 2d 101, 120 (D.D.C. 2012) (denying motion to dismiss plaintiff's claim for violation of Canada's trademark law, and noting that "if there is no conflict between the competing jurisdiction, the law of the forum state applies"); *Phelps v. Stomber*, 883 F. Supp. 2d 188, 227-28 (D.D.C. 2012) (finding that U.S. law applied to claims pleaded as violations of Dutch law).

When Washington's Antidilution Act is properly interpreted to apply to dilution that occurs within the state of Washington, Trader Joe's Complaint easily states a claim under the statute. Trader Joe's contends that Hallatt's resale of TRADER JOE'S-branded products outside Trader Joe's quality control structure is likely to dilute the value of the TRADER JOE'S mark in the eyes of its customers, thereby injuring Trader Joe's business reputation and destroying the goodwill and public trust Trader Joe's has spent decades accumulating. ER90-91, ER93.[8] Although the final resale activity occurs in Vancouver, Canada, the resulting dilution occurs both in Canada *and* in Washington: If customers become sick from TRADER JOE'S-branded food products that were purchased from Pirate Joe's, news of that foodborne illness is likely to be reported as "Trader Joe's product

---

[8] The Lanham Act's quality control theory of dilution applies to Trader Joe's state law dilution claim because Washington's Trademark Act provides that its interpretation should be guided by the federal courts' interpretation of the Lanham Act. *See* RCW § 19.77.930.

makes Vancouver residents sick." ER93. A customer fifty miles south of Vancouver, Canada, in Bellingham, Washington, coming across this story is likely to assume that these products were purchased from the Trader Joe's Bellingham store—the closest Trader Joe's store to Vancouver, Canada. This customer may question whether Trader Joe's quality control structure is sound, and he or she may decide to cease shopping there. And with eighteen stores within the state of Washington, much of the resulting dilution will be felt in Washington.

Nothing in Washington's Antidilution Act supports the territorial limitations applied by the district court, and Hallatt has waived any challenges to venue or personal jurisdiction by omitting them from his Rule 12(b)(1) and 12(b)(6) motions. *Am. Ass'n of Naturopathic Physicians v. Hayhurst*, 227 F.3d 1104, 1106 (9th Cir. 2000). This Court should thus reverse.

## B. The District Court Erred in Dismissing Trader Joe's CPA Claim

Washington's Consumer Protection Act prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." RCW § 19.86.020. Its stated purpose is "to complement the body of federal law governing restraints of trade, unfair competition and unfair, deceptive, and fraudulent acts or practices in order to protect the public and foster fair and honest competition." RCW § 19.86.920. The Act "is intended to provide broader protection than exists under the common law or statute." *Panag v. Farmers Ins.*

54

*Co. of Wash.*, 204 P.3d 885, 898 (Wash. 2009). It allows a private party to bring

an action, and be entitled to attorneys' fees, if it establishes five factors: "(1) unfair

or deceptive act or practice; (2) occurring in trade or commerce; (3) public interest

impact; (4) injury to plaintiff in his or her business or property; (5) causation."

*Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 719 P.2d 531, 532

(Wash. 1986).

In his motion to dismiss, Hallatt only challenged the second requirement—

a deceptive act or practice "occurring in trade or commerce." D. Ct. Dkt. No. 39 at

6-8. Hallatt argued that this requirement was not satisfied because Pirate Joe's

reselling of TRADER JOE'S-branded goods and infringement of Trader Joe's

trademarks and trade dress occurred outside Washington. *Id.* The district court

agreed. Operating only from basic principles, and citing no law in support, it

concluded that "it would be overreaching to apply the Washington CPA where the

alleged wrongful conduct is taking place entirely out of state and no party involved

is a Washington resident." ER11.

The district court's conclusion flatly contradicts the express language of the

statute, controlling state law, and federal court case law interpreting Washington's

CPA. The CPA provides that it is to be "liberally construed that its beneficial

purposes may be served." RCW § 19.86.920. That purpose is to protect against

unfair competition and unfair or deceptive acts or practice "in the conduct of *any*

*trade or commerce.*"  *Id*. (emphasis added).  By statute, "trade or commerce" is defined broadly to include "the sale of assets and services," as well as "any commerce directly or indirectly affecting the people of the state of Washington." RCW § 19.86.010(2).

In light of this clear statutory directive, the Washington Supreme Court has repeatedly rejected attempts to place additional restrictions on the Act's broad description of "trade or commerce."  *See Hangman Ridge*, 719 P.2d at 535 ("The CPA, on its face, shows a carefully drafted attempt to bring within its reaches every person who conducts unfair or deceptive acts or practices in *any trade or commerce*") (emphasis added); *Panag*, 204 P.3d at 891 (citing CPA's broad definition of "trade or commerce" in rejecting argument that "trade or commerce" required "consumer or business relationship" between plaintiff and defendant).  It has refused to "intermingle" the "trade or commerce" requirement with the other *Hangman Ridge* factors.  *Panag*, 204 P.3d at 894 ("[P]laintiff's injury, the fourth element, is an element distinct from occurrence of the violation in trade or commerce, the second element").  And the Court has specifically found that trademark infringement constitutes activity in trade or commerce.  *Nordstrom, Inc. v. Tampourlos*, 733 P.2d 208 (Wash. 1987).  Because the district court here was interpreting Washington state law, it was required to follow the guidance from

these decisions of the Washington Supreme Court. *Eichacker v. Paul Revere Life Ins. Co.*, 354 F.3d 1142, 1145 (9th Cir. 2004).

The district court concluded that the legislature could not possibly have meant the CPA to apply to extraterritorial activity. ER10-11. But it cited no law in support. This Court and others have held that Washington's CPA does apply extraterritorially. *E.g.*, *Lion Hotels Franchising, Inc. v. MAK, LLC*, 663 F.3d 1080, 1091 (9th Cir. 2011) (acknowledging extraterritorial reach of Washington's CPA); *Rajagopalan v. NoteWorld,* LLC, No. C11–05574, 2012 WL 727075, at *5 (W.D. Wash. Mar. 6, 2012) (rejecting defendant's argument that North Carolina resident could not assert CPA claims against defendant in Washington); *McGinnis v. T-Mobile USA, Inc.*, No. C08-106Z, 2008 WL 4772127, at *1 (W.D. Wash. Oct. 8, 2008) (denying motion to dismiss CPA claim and collecting cases holding that non-residents have standing to sue under Washington's CPA).

The district court erred in dismissing Trader Joe's CPA claim because the only disputed element of that claim—defendant's conduct in "trade or commerce"—is clearly satisfied. Hallatt engages in a persistent pattern of "trade or commerce" by traveling into Washington, purchasing products from Trader Joe's stores (or hiring people in Washington to shop for him), exporting the goods to Canada, and reselling them. This Court should reverse the district court's decision.

**CONCLUSION**

For all of the foregoing reasons, this Court should reverse the district court's orders, vacate the judgment, and remand for further proceedings.

Respectfully submitted,

Date:  May 23, 2014

By:  /s/ Brian M. Berliner
Brian M. Berliner
of O'Melveny & Myers LLP

*Attorneys for Plaintiff-Appellant*
*Trader Joe's Company*

## STATEMENT OF RELATED CASES

Trader Joe's is not aware of any related cases currently pending in this

Court.

Respectfully submitted,

Date:  May 23, 2014                    By:    /s/ Brian M. Berliner
                                              Brian M. Berliner
                                              of O'Melveny & Myers LLP

59

## CERTIFICATE OF COMPLIANCE

Counsel for Plaintiff-Appellant Trader Joe's Company certifies:

1.     This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B). This brief contains 13,213 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.     This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6). This brief has been prepared in a proportionally spaced typeface using Word 2010 in 14-point Times New Roman.

Respectfully submitted,

Date: May 23, 2014           By:   /s/ Brian M. Berliner
                                        Brian M. Berliner
                                        of O'Melveny & Myers LLP

## CERTIFICATE OF FILING AND SERVICE

Counsel was served via CM/ECF which constitutes service, pursuant to Fed.

R. App. P. 25(c)(2) and Ninth Circuit Rule 25-5(g), to all registered CM/ECF

users.

Respectfully submitted,


Date: May 23, 2014          By:  /s/ Brian M. Berliner
                                 Brian M. Berliner
                                 of O'Melveny & Myers LLP

# ADDENDUM PURSUANT TO
# NINTH CIRCUIT RULE 28-2.7

## TABLE OF CONTENTS

15 U.S.C. § 1051 ........................................................................................2

15 U.S.C. § 1062 ........................................................................................5

15 U.S.C. § 1065 ........................................................................................5

15 U.S.C. § 1116 ........................................................................................5

15 U.S.C. § 1117 ........................................................................................6

15 U.S.C. § 1121 ........................................................................................7

15 U.S.C. § 1125 ........................................................................................7

15 U.S.C. § 1127 ......................................................................................11

RCW § 19.77.160 .....................................................................................11

RCW § 19.77.930 .....................................................................................12

RCW § 19.86.010 .....................................................................................12

RCW § 19.86.020 .....................................................................................12

RCW § 19.86.920 .....................................................................................13

**15 U.S.C. § 1051**
**Application for registration; verification**

(a) Application for use of trademark

(1) The owner of a trademark used in commerce may request registration of its trademark on the principal register hereby established by paying the prescribed fee and filing in the Patent and Trademark Office an application and a verified statement, in such form as may be prescribed by the Director, and such number of specimens or facsimiles of the mark as used as may be required by the Director.

(2) The application shall include specification of the applicant's domicile and citizenship, the date of the applicant's first use of the mark, the date of the applicant's first use of the mark in commerce, the goods in connection with which the mark is used, and a drawing of the mark.

(3) The statement shall be verified by the applicant and specify that—

(A) the person making the verification believes that he or she, or the juristic person in whose behalf he or she makes the verification, to be the owner of the mark sought to be registered;

(B) to the best of the verifier's knowledge and belief, the facts recited in the application are accurate;

(C) the mark is in use in commerce; and

(D) to the best of the verifier's knowledge and belief, no other person has the right to use such mark in commerce either in the identical form thereof or in such near resemblance thereto as to be likely, when used on or in connection with the goods of such other person, to cause confusion, or to cause mistake, or to deceive, except that, in the case of every application claiming concurrent use, the applicant shall—

(i) state exceptions to the claim of exclusive use; and—

(ii) shall specify, to the extent of the verifier's knowledge—

(I) any concurrent use by others;

(II) the goods on or in connection with which and the areas in which each concurrent use exists;

(III) the periods of each use; and

2

(IV) the goods and area for which the applicant desires registration.

(4) The applicant shall comply with such rules or regulations as may be prescribed by the Director. The Director shall promulgate rules prescribing the requirements for the application and for obtaining a filing date herein.

(b) Application for bona fide intention to use trademark

(1) A person who has a bona fide intention, under circumstances showing the good faith of such person, to use a trademark in commerce may request registration of its trademark on the principal register hereby established by paying the prescribed fee and filing in the Patent and Trademark Office an application and a verified statement, in such form as may be prescribed by the Director.

(2) The application shall include specification of the applicant's domicile and citizenship, the goods in connection with which the applicant has a bona fide intention to use the mark, and a drawing of the mark.

(3) The statement shall be verified by the applicant and specify—

(A) that the person making the verification believes that he or she, or the juristic person in whose behalf he or she makes the verification, to be entitled to use the mark in commerce;

(B) the applicant's bona fide intention to use the mark in commerce;

(C) that, to the best of the verifier's knowledge and belief, the facts recited in the application are accurate; and

(D) that, to the best of the verifier's knowledge and belief, no other person has the right to use such mark in commerce either in the identical form thereof or in such near resemblance thereto as to be likely, when used on or in connection with the goods of such other person, to cause confusion, or to cause mistake, or to deceive.

Except for applications filed pursuant to section 1126 of this title, no mark shall be registered until the applicant has met the requirements of subsections (c) and (d) of this section.

(4) The applicant shall comply with such rules or regulations as may be prescribed by the Director. The Director shall promulgate rules prescribing the requirements for the application and for obtaining a filing date herein.

(c) Amendment of application under subsection (b) to conform to requirements of subsection (a)

3

At any time during examination of an application filed under subsection (b) of this section, an applicant who has made use of the mark in commerce may claim the benefits of such use for purposes of this chapter, by amending his or her application to bring it into conformity with the requirements of subsection (a) of this section.

(d) Verified statement that trademark is used in commerce

(1) Within six months after the date on which the notice of allowance with respect to a mark is issued under section 1063(b)(2) of this title to an applicant under subsection (b) of this section, the applicant shall file in the Patent and Trademark Office, together with such number of specimens or facsimiles of the mark as used in commerce as may be required by the Director and payment of the prescribed fee, a verified statement that the mark is in use in commerce and specifying the date of the applicant's first use of the mark in commerce and those goods or services specified in the notice of allowance on or in connection with which the mark is used in commerce. Subject to examination and acceptance of the statement of use, the mark shall be registered in the Patent and Trademark Office, a certificate of registration shall be issued for those goods or services recited in the statement of use for which the mark is entitled to registration, and notice of registration shall be published in the Official Gazette of the Patent and Trademark Office. Such examination may include an examination of the factors set forth in subsections (a) through (e) of section 1052 of this title. The notice of registration shall specify the goods or services for which the mark is registered.

(2) The Director shall extend, for one additional 6-month period, the time for filing the statement of use under paragraph (1), upon written request of the applicant before the expiration of the 6-month period provided in paragraph (1). In addition to an extension under the preceding sentence, the Director may, upon a showing of good cause by the applicant, further extend the time for filing the statement of use under paragraph (1) for periods aggregating not more than 24 months, pursuant to written request of the applicant made before the expiration of the last extension granted under this paragraph. Any request for an extension under this paragraph shall be accompanied by a verified statement that the applicant has a continued bona fide intention to use the mark in commerce and specifying those goods or services identified in the notice of allowance on or in connection with which the applicant has a continued bona fide intention to use the mark in commerce. Any request for an extension under this paragraph shall be accompanied by payment of the prescribed fee. The Director shall issue regulations setting forth guidelines for determining what constitutes good cause for purposes of this paragraph.

(3) The Director shall notify any applicant who files a statement of use of the acceptance or refusal thereof and, if the statement of use is refused, the reasons for the refusal. An applicant may amend the statement of use.

(4) The failure to timely file a verified statement of use under paragraph (1) or an extension request under paragraph (2) shall result in abandonment of the application, unless it can be shown to the satisfaction of the Director that the delay in responding was

unintentional, in which case the time for filing may be extended, but for a period not to exceed the period specified in paragraphs (1) and (2) for filing a statement of use.

(e) Designation of resident for service of process and notices

If the applicant is not domiciled in the United States the applicant may designate, by a document filed in the United States Patent and Trademark Office, the name and address of a person resident in the United States on whom may be served notices or process in proceedings affecting the mark. Such notices or process may be served upon the person so designated by leaving with that person or mailing to that person a copy thereof at the address specified in the last designation so filed. If the person so designated cannot be found at the address given in the last designation, or if the registrant does not designate by a document filed in the United States Patent and Trademark Office the name and address of a person resident in the United States on whom may be served notices or process in proceedings affecting the mark, such notices or process may be served on the Director.

## 15 U.S.C. § 1062
### Publication

(a) Examination and publication

Upon the filing of an application for registration and payment of the prescribed fee, the Director shall refer the application to the examiner in charge of the registration of marks, who shall cause an examination to be made and, if on such examination it shall appear that the applicant is entitled to registration, or would be entitled to registration upon the acceptance of the statement of use required by section 1051(d) of this title, the Director shall cause the mark to be published in the Official Gazette of the Patent and Trademark Office: *Provided,* That in the case of an applicant claiming concurrent use, or in the case of an application to be placed in an interference as provided for in section 1066 of this title the mark, if otherwise registrable, may be published subject to the determination of the rights of the parties to such proceedings.

. . . .

## 15 U.S.C. § 1065
### Incontestability of right to use mark under certain conditions

Except on a ground for which application to cancel may be filed at any time under paragraphs (3) and (5) of section 1064 of this title, and except to the extent, if any, to which the use of a mark registered on the principal register infringes a valid right acquired under the law of any State or Territory by use of a mark or trade name continuing from a date prior to the date of registration under this chapter of such registered mark, the right of the owner to use such registered mark in commerce for the goods or services on or in connection with which such registered mark has been in continuous use for five consecutive years subsequent to the date of such registration and is still in use in commerce, shall be incontestable: *Provided,* That—

(1) there has been no final decision adverse to the owner's claim of ownership of such mark for such goods or services, or to the owner's right to register the same or to keep the same on the register; and

(2) there is no proceeding involving said rights pending in the United States Patent and Trademark Office or in a court and not finally disposed of; and

(3) an affidavit is filed with the Director within one year after the expiration of any such five-year period setting forth those goods or services stated in the registration on or in connection with which such mark has been in continuous use for such five consecutive years and is still in use in commerce, and other matters specified in paragraphs (1) and (2) of this section; and

(4) no incontestable right shall be acquired in a mark which is the generic name for the goods or services or a portion thereof, for which it is registered.

Subject to the conditions above specified in this section, the incontestable right with reference to a mark registered under this chapter shall apply to a mark registered under the Act of March 3, 1881, or the Act of February 20, 1905, upon the filing of the required affidavit with the Director within one year after the expiration of any period of five consecutive years after the date of publication of a mark under the provisions of subsection (c) of section 1062 of this title.

The Director shall notify any registrant who files the above-prescribed affidavit of the filing thereof.

### 15 U.S.C. § 1116
### Injunctive relief

(a) Jurisdiction; service

The several courts vested with jurisdiction of civil actions arising under this chapter shall have power to grant injunctions, according to the principles of equity and upon such terms as the court may deem reasonable, to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office or to prevent a violation under subsection (a), (c), or (d) of section 1125 of this title. Any such injunction may include a provision directing the defendant to file with the court and serve on the plaintiff within thirty days after the service on the defendant of such injunction, or such extended period as the court may direct, a report in writing under oath setting forth in detail the manner and form in which the defendant has complied with the injunction. Any such injunction granted upon hearing, after notice to the defendant, by any district court of the United States, may be served on the parties against whom such injunction is granted anywhere in the United States where they may be found, and shall be operative and may be enforced by proceedings to punish for contempt, or otherwise, by the court by which such injunction was granted, or by any other United States district court in whose jurisdiction the defendant may be found.

. . . .

6

**15 U.S.C. § 1117**
**Recovery for violation of rights**

(a) Profits; damages and costs; attorney fees

When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office, a violation under section 1125(a) or (d) of this title, or a willful violation under section 1125(c) of this title, shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled, subject to the provisions of sections 1111 and 1114 of this title, and subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. The court shall assess such profits and damages or cause the same to be assessed under its direction. In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty. The court in exceptional cases may award reasonable attorney fees to the prevailing party.

. . . .

**15 U.S.C. § 1121**
**Jurisdiction of Federal courts; State and local requirements that registered trademarks be altered or displayed differently; prohibition**

(a) The district and territorial courts of the United States shall have original jurisdiction and the courts of appeal of the United States (other than the United States Court of Appeals for the Federal Circuit) shall have appellate jurisdiction, of all actions arising under this chapter, without regard to the amount in controversy or to diversity or lack of diversity of the citizenship of the parties.

. . . .

**15 U.S.C. § 1125**
**False designations of origin, false descriptions, and dilution forbidden**

(a) Civil action

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

7

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

(2) As used in this subsection, the term "any person" includes any State, instrumentality of a State or employee of a State or instrumentality of a State acting in his or her official capacity. Any State, and any such instrumentality, officer, or employee, shall be subject to the provisions of this chapter in the same manner and to the same extent as any nongovernmental entity.

(3) In a civil action for trade dress infringement under this chapter for trade dress not registered on the principal register, the person who asserts trade dress protection has the burden of proving that the matter sought to be protected is not functional.

(b) Importation

Any goods marked or labeled in contravention of the provisions of this section shall not be imported into the United States or admitted to entry at any customhouse of the United States. The owner, importer, or consignee of goods refused entry at any customhouse under this section may have any recourse by protest or appeal that is given under the customs revenue laws or may have the remedy given by this chapter in cases involving goods refused entry or seized.

(c) Dilution by blurring; dilution by tarnishment

(1) Injunctive relief

Subject to the principles of equity, the owner of a famous mark that is distinctive, inherently or through acquired distinctiveness, shall be entitled to an injunction against another person who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury.

(2) Definitions

(A) For purposes of paragraph (1), a mark is famous if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner. In determining whether a mark

8

possesses the requisite degree of recognition, the court may consider all relevant factors, including the following:

> (i) The duration, extent, and geographic reach of advertising and publicity of the mark, whether advertised or publicized by the owner or third parties.

> (ii) The amount, volume, and geographic extent of sales of goods or services offered under the mark.

> (iii) The extent of actual recognition of the mark.

> (iv) Whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

(B) For purposes of paragraph (1), "dilution by blurring" is association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark. In determining whether a mark or trade name is likely to cause dilution by blurring, the court may consider all relevant factors, including the following:

> (i) The degree of similarity between the mark or trade name and the famous mark.

> (ii) The degree of inherent or acquired distinctiveness of the famous mark.

> (iii) The extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark.

> (iv) The degree of recognition of the famous mark.

> (v) Whether the user of the mark or trade name intended to create an association with the famous mark.

> (vi) Any actual association between the mark or trade name and the famous mark.

(C) For purposes of paragraph (1), "dilution by tarnishment" is association arising from the similarity between a mark or trade name and a famous mark that harms the reputation of the famous mark.

(3) Exclusions

The following shall not be actionable as dilution by blurring or dilution by tarnishment under this subsection:

9

(A) Any fair use, including a nominative or descriptive fair use, or facilitation of such fair use, of a famous mark by another person other than as a designation of source for the person's own goods or services, including use in connection with—

    (i) advertising or promotion that permits consumers to compare goods or services; or

    (ii) identifying and parodying, criticizing, or commenting upon the famous mark owner or the goods or services of the famous mark owner.

(B) All forms of news reporting and news commentary.

(C) Any noncommercial use of a mark.

(4) Burden of proof

In a civil action for trade dress dilution under this chapter for trade dress not registered on the principal register, the person who asserts trade dress protection has the burden of proving that—

(A) the claimed trade dress, taken as a whole, is not functional and is famous; and

(B) if the claimed trade dress includes any mark or marks registered on the principal register, the unregistered matter, taken as a whole, is famous separate and apart from any fame of such registered marks.

(5) Additional remedies

In an action brought under this subsection, the owner of the famous mark shall be entitled to injunctive relief as set forth in section 1116 of this title. The owner of the famous mark shall also be entitled to the remedies set forth in sections 1117(a) and 1118 of this title, subject to the discretion of the court and the principles of equity if—

(A) the mark or trade name that is likely to cause dilution by blurring or dilution by tarnishment was first used in commerce by the person against whom the injunction is sought after October 6, 2006; and

(B) in a claim arising under this subsection—

    (i) by reason of dilution by blurring, the person against whom the injunction is sought willfully intended to trade on the recognition of the famous mark; or

    (ii) by reason of dilution by tarnishment, the person against whom the injunction is sought willfully intended to harm the reputation of the famous mark. . . . .

### 15 U.S.C. § 1127
### Construction and definitions; intent of chapter

In the construction of this chapter, unless the contrary is plainly apparent from the context—

The United States includes and embraces all territory which is under its jurisdiction and control.

The word "commerce" means all commerce which may lawfully be regulated by Congress.

. . . .

The intent of this Act is to regulate commerce within the control of Congress by making actionable the deceptive and misleading use of marks in such commerce; to protect registered marks used in such commerce from interference by State, or territorial legislation; to protect persons engaged in such commerce against unfair competition; to prevent fraud and deception in such commerce by the use of reproductions, copies, counterfeits, or colorable imitations of registered marks; and to provide rights and remedies stipulated by treaties and conventions respecting trademarks, trade names, and unfair competition entered into between the United States and foreign nations.

### RCW 19.77.160
### Injunctive relief for owners of famous marks

(1) The owner of a mark that is famous in this state shall be entitled, subject to the principles of equity and upon such terms as the court deems reasonable, to an injunction against another person's commercial use in this state of a mark, commencing after the mark becomes famous, which causes dilution of the distinctive quality of the mark, and to obtain such other relief as is provided in this section. In determining whether a mark is famous and has distinctive quality, a court shall consider all relevant factors, including, but not limited to the following:

    (a) The degree or inherent or acquired distinctiveness of the mark in this state;

    (b) The duration and extent of use of the mark in connection with the goods or services with which the mark is used;

    (c) The duration and extent of advertising and publicity of the mark in this state;

    (d) The geographical extent of the trading area in which the mark is used;

    (e) The channels of trade for the goods or services with which the mark is used;

    (f) The degree of recognition of the mark in the trading areas and channels of trade in this state used by the mark's owner and the person against whom the injunction is sought;

    (g) The nature and extent of use of the same or similar marks by third parties; and

    (h) Whether the mark is the subject of state registration in this state or United States registration.

(2) The owner shall be entitled only to injunctive relief in an action brought under this section, unless the subsequent user willfully intended to trade on the owner's reputation or to cause dilution of the owner's mark. If such willful intent is proven, the owner shall also be entitled to the remedies set forth in this chapter, subject to the discretion of the court and the principles of equity.

(3) The following are not actionable under this section:

(a) Fair use of a famous mark by another person in comparative commercial advertising or promotion to identify competing goods or services of the owner of the famous mark;

(b) Noncommercial use of a famous mark; and

(c) All forms of reporting and news commentary.

**RCW 19.77.930**
**Construction**

It is the intent of the legislature that, in construing this chapter, the courts be guided by the interpretation given by the federal courts to the federal trademark act of 1946, as amended, 15 U.S.C., Sec. 1051, et seq.

**RCW 19.86.010**
**Definitions**

As used in this chapter:

(1) "Person" shall include, where applicable, natural persons, corporations, trusts, unincorporated associations and partnerships.

(2) "Trade" and "commerce" shall include the sale of assets or services, and any commerce directly or indirectly affecting the people of the state of Washington.

(3) "Assets" shall include any property, tangible or intangible, real, personal, or mixed, and wherever situate, and any other thing of value.

**RCW 19.86.020**
**Unfair competition, practices, declared unlawful**

Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.

**RCW 19.86.920**
**Purpose—Interpretation—Liberal construction—Saving**

The legislature hereby declares that the purpose of this act is to complement the body of federal law governing restraints of trade, unfair competition and unfair, deceptive, and fraudulent acts or practices in order to protect the public and foster fair and honest competition. It is the intent of the legislature that, in construing this act, the courts be guided by final decisions of the federal courts and final orders of the federal trade commission interpreting the various federal statutes dealing with the same or similar matters and that in deciding whether conduct restrains or monopolizes trade or commerce or may substantially lessen competition, determination of the relevant market or effective area of competition shall not be limited by the boundaries of the state of Washington. To this end this act shall be liberally construed that its beneficial purposes may be served.

It is, however, the intent of the legislature that this act shall not be construed to prohibit acts or practices which are reasonable in relation to the development and preservation of business or which are not injurious to the public interest, nor be construed to authorize those acts or practices which unreasonably restrain trade or are unreasonable per se.